**WASHINGTON TERMINAL CO. v.
BOSWELL et al.**

No. 7465.

United States Court of Appeals for the
District of Columbia.

Decided Nov. 18, 1941.

Mr. John Dickinson, of Philadelphia, Pa., with whom Mr. Henry L. Walker, of Washington, D. C., was on the brief, for appellants.

Mr. Frank L. Mulholland, of Toledo, Ohio, with whom Messrs. Willard H. McEwen, of Toledo, Ohio, and William E. Willis, of Washington, D. C., were on the brief, for appellees.

Before STEPHENS, MILLER, and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The Declaratory Judgments Act, 48 Stat. 955, was enacted June 14, 1934.[1] One week later the Railway Labor Act, Act of June 21, 1934, 48 Stat. 1185, 45 U.S.C.A. § 151 et seq., was passed. The latter established the National Railway Adjustment Board for settlement of disputes arising under collective agreements between the carriers and their employees. The Board's awards are not enforceable by it. But awards in favor of employees may be enforced by suit in the district courts begun within two years from accrual of the causes of action under them. 45 U.S.C.A. § 153, First (p), (q).

In such a suit the Act gives the employee definite and substantial advantages. Id. (p). It does not expressly make the enforcement suit exclusive of others to determine rights arising under collective agreements. The question in this case is whether it has done so impliedly, as to a carrier and employees who have utilized the adjustment procedure and procured an award. Stated otherwise, the issue is whether a carrier, which has been unsuccessful before the Board, can maintain a suit for a declaratory judgment of rights under the original collective agreement during the two years which the Act allows for the employees' enforcement suit. We think the answer should be negative, and therefore the District Court was right in dismissing the complaint of the carrier, appellant here.

The decision in Moore v. Illinois Central R. Co., 1941, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, rendered since this case was argued, has put beside the point much of the argument here. The case held that the Railway Labor Act does not preclude an employee from bringing a suit for damages for alleged wrongful discharge contrary to a collective agreement. The plaintiff employee, however, had begun his suit before the administrative machinery had been set in motion. The decision establishes that in such circumstances the Act has neither excluded the general jurisdiction of the courts nor made exhaustion of the administrative remedy prerequisite to its exercise, for decision of controversies which might be determined by the statutory method. At the threshold of controversy accordingly, the disputants have alternate routes which they may follow. One is entirely judicial, without regard to the Railway Labor Act. The other is administrative and judicial, according to its terms.

---

[1] The Act was amended by Act of August 30, 1935, 49 Stat. 1027, 28 U.S.C. § 400.

But the Moore case neither presented nor decided the question whether, when one party has put the adjustment procedure in operation, the other may disregard it entirely and at any subsequent stage have a judicial determination of the issues other than that provided by the Act. From the fact that either party may go directly into court in the beginning for relief independent of the statute, it does not follow that he or the other may short-circuit the administrative proceeding while it is in progress or the statutory enforcement suit during the two years allowed for bringing it.[2] That is true, whether the matter be regarded as involving the existence of jurisdiction in the courts independently of the Act or merely sound judicial discretion in its exercise.

In this case the dispute arose under a collective agreement made February 1, 1923, between the plaintiff carrier and two labor unions,[3] which represented the employees who are the defendants. The agreement fixed seniority rights and other terms of employment of enginemen and firemen. In 1934 defendants asserted they were entitled under the agreement to perform certain work which others previously had done. This consisted chiefly in moving empty passenger cars from the storage yard to the Union Terminal Passenger Station in Washington, D. C., and vice versa, preceding and following, respectively, the departure and arrival of trains on interstation runs. The regular train crews had done and still do this work. They are employees of the railroads—called the tenant lines—which use the station's terminal facilities.

Plaintiff rejected defendants' claim. Thereafter they invited it to make a joint submission of the dispute to the Board. Plaintiff declined. But, as the Act entitled them to do,[4] defendants submitted it. Plaintiff thereupon appeared in the proceedings and made full submission on the merits in accordance with the statutory provisions.[5]

The Board, acting by its First Division, deadlocked. A referee was appointed as the Act requires in such an event and, with his participation, the Board's award was made October 24, 1938. It held that the contract entitled the employees to perform the work in question. The same day the Board ordered the employer to make the award effective within thirty days. Plaintiff has not complied. Instead, on December 29, 1938, it filed this suit. It was begun, therefore, slightly more than one month from the day on which the employees' cause of action arose on the award, although the Act gave them two years to sue upon it and made no provision for an employer's suit to set it aside or restrain its enforcement.[6]

I.

The suit asks for an adjudication of rights under the original contract. It seeks also a declaration that the Board's award and order are void. Whether or not the issues in suit and those of the administrative proceeding are identical in all respects,[7] they are so to the extent that each

---

[2] The facts do not require us to be concerned with the question whether suit independent of the statute could be instituted by either party after the expiration of the two-year period. But cf. infra this opinion.

[3] The Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen.

[4] Section 3, First (i), 45 U.S.C.A. § 153, First (i), requires private negotiation up to the carrier's chief operating officer for handling disputes, and provides: "but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board * * *."

[5] Although plaintiff declined to make a joint submission, when defendants submitted the dispute plaintiff made no objection to the Board's jurisdiction but appeared and participated in the proceedings throughout without questioning the Board's power to make an award. It need not be decided whether plaintiff might have refrained from appearing or participating. It elected to do so, and thus had the full benefit of the proceeding. If the proceeding had been a suit in court, the appearance would have been a general one.

[6] The facts have been stated only in essential outline. A more detailed statement appears in the able dissenting opinion, to which reference is made in the interest of economy of space.

[7] Under Section 3, First (p), 45 U.S.C. A. § 153, First (p), the employee's petition in the enforcement suit must set forth "the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises." He is not limited to matters stated in the award, nor is the carrier in its defenses. But those matters necessarily are in issue,

involves the question whether the collective agreement, rightly interpreted, gives the employee defendants the right to do the work in dispute. That is the fundamental issue presented in both. The effect, therefore, of a declaratory judgment favorable to plaintiff would be to nullify the award. Consequently this suit is essentially one to review it. Whether the judgment were in plaintiff's favor or otherwise, allowing the suit to be maintained would deprive the employees of the special advantages which the Act confers upon them in the enforcement suit.

We do not think that Congress intended the Board's awards to be reviewable in this manner. The Railway Labor Act makes no provision for review as such. But it does set forth a definite and special scheme for securing judicial determination that the award is or is not in accordance with the legal rights of the parties. If the scheme is adequate constitutionally, as we think it is, we do not believe Congress intended that it should be circumvented by free resort to other forms of judicial review or determination de novo of the merits of the controversy.

■ If Congress had made no provision for judicial review, in the broad sense we have indicated, the general applicability of the Declaratory Judgments Act, adopted almost simultaneously, might be regarded as supplying the omission. But the matter was not an omitted one. This is shown conclusively by the presence in the Railway Labor Act of the detailed plan for review. It is shown further by the character of the plan's details. We think these things show,

too, that the method of review provided was intended to be exclusive. If Congress had intended the Declaratory Judgments Act to be generally available to the parties, regardless of the fact that an award had been made and of its terms, there could have been no substantial reason for including in the Railway Labor Act the complex and detailed provisions for the enforcement suit or, for that matter, any special method of review. More especially, there could have been no such reason for writing into the statute the unusual and highly important special advantages given to the employee seeking enforcement.

■ Congress intended these advantages to mean something. They mean nothing if such a suit as this can be maintained. They are very substantial advantages. They are conferred by Section 3, First (p) of the Act, 45 U.S.C.A. § 153, First (p), which is set out in full below.[8] Their purpose and effect, as will be seen, is to equalize the burden, financial and otherwise, of extended litigation as between employees and the carriers. The Act contemplates suits by individual employees as well as by labor unions. It recognizes the unequal financial position of the litigants when a railway laborer pits his strength against his employer's in court. Whatever may be true of unions, individual employees do not maintain corporate legal departments, sustained by revenues derived from the public. They cannot charge off attorneys' fees to business expense. Often their own resources would be inadequate to secure competent counsel. The relief sought often does not include recovery of money, so that

---

and generally they are the only ones when the dispute, the administrative proceeding and the award involve interpretation and application of agreement. The suit is de novo, not merely one for review proper.

8 "If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial

of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, or as may be appropriate to enforce or set aside the order of the division of the Adjustment Board."

a contingent fee payable only from the proceeds of recovery or the employee's resources frequently would not be attractive. Congress recognized this inequality and undertook to reduce it. Hence, the Act provides for recovery of an attorney's fee, if the employee is successful in the suit. 45 U.S.C.A. § 153, First (p). Costs of litigation alone are prohibitive, particularly to laboring people suing as individuals. Hence the petitioner in an enforcement suit is exempted from their payment, except those that accrue upon his appeal. Situs of litigation may be highly important, also as a matter of expense, to the complaining employee. Hence he may sue where he resides or where the carrier's principal operating office is located. Choice of venue in litigation which is unequal because of the financial advantage of the other party may mean the difference between asserting one's rights in court and foregoing them altogether. All these advantages, choice of venue, exemption from payment of costs, and recovery of attorney's fees if successful, are intended to make less unequal than in ordinary or general litigation the contest between employee and carrier over work and the terms on which it is done. The latter is equipped for litigation, to the last resort. The former is not. In equalizing the struggle somewhat, Congress has recognized that justice too often is blind to financial inequality between the parties in litigation, especially when they are employer and employee, and has determined that it shall not be entirely so in these disputes.

█ The statute also relieves the employee of another burden. It provides that the enforcement suit "shall proceed in all respects as other civil suits, except that on the trial * * * the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated." 45 U.S.C.A. § 153, First (p). The burden of proof, in making a prima facie case, may be financial as well as procedural, and it may be heavy. The statute relieves the employee of this, at

least to some extent, when he introduces the findings and order in evidence. Though they may not make his case finally, they do so initially. They also bring to the court the weight of decision on facts and law by men experienced in contracts, disputes and proceedings of this special and complicated character. The whole adjustment procedure up to the point of award, findings and order by the Board, appears to be constructed upon the idea that it is not the business of lawyers, but is the business of railroad men, workers and managers alike.[9] That does not make their findings and decisions less probative; rather it should make them more so. They know the language,[10] functions and purposes of railroads and of their collective agreements. Their judgment is informed by experience in negotiating and administering these contracts. Because of this they, perhaps better than lawyers, are qualified to interpret and apply them. Whether so or not, their judgment should carry weight when the judicial stage of controversy is reached. It cannot be assumed, therefore, that the findings have no substantive effect, merely because they were not given finality, as to either facts or law. They are probative, not merely presumptive in value, having effect fairly comparable to that of expert testimony.

█ All these advantages the statute makes incident to the enforcement suit. They cannot be had in any other. We have no power to grant them in this one. Yet the argument that it can be maintained brushes them aside, as if they were mere matters of procedure, not affecting the substance of decision or right. With that we cannot agree. In many cases their absence would mean the denial of decision and of right. In others the burden of securing these would be increased. When Congress created the advantages, we think it intended they should be available in all suits essentially for review of the Board's awards, at any rate during the two years allowed for bringing enforcement suits. We do not believe it meant to set up a race of dili-

---

[9] As will be shown, infra, the Act appears designed to reduce resort to the courts for determination of these controversies to a minimum, consistent with adequate constitutional protection for the rights of the disputants.

[10] An instance of railroad vocabulary is cited in Garrison, The National Rail-

road Adjustment Board: A Unique Administrative Agency (1937) 46 Yale L. J. 567, 569, note 10: "The following bulletin was issued by a superintendent of the Southern Pacific Ry. in San Jose, Cal., on Dec. 20, 1928: 'All Yardmasters: Effective date, all yardmen in cannon-ball service bringing drags in yard from outside points will bleed and cut own cars.'"

gence between employer and employees to see which could beat the other into court after an award is made. The terms of the Act, particularly Section 3, First (p), clearly negative such an idea. Yet that will be the inevitable result of allowing other than enforcement suits during the period of limitations. Congress had no purpose to give the statutory advantages to the employee if he should beat his employer to the courthouse, but to take them away if he should come in second. That is true whether the employer's suit is one to restrain enforcement of the award, set it aside, declare it void, or reinterpret the original contract with the same effects upon the award. If a carrier can have full advantage of the administrative proceeding,[11] on the chance it will be successful, yet when the event is otherwise relieve itself of all its disadvantages, circumventing the employee's rights by judicial proceedings in which they are not available, the Railway Labor Act will have become, finally, a dead letter. The Board's awards would amount to nothing more than innocuous advice to the disputants, like that provided for under the Railway Labor Act of 1920, 41 Stat. 473 (1920), 45 U.S.C.A. § 144 (1926), or mere proposals for a new agreement, having not even the force of an offer in the law of contracts. If that is the result of the Act and of an award, Congress went to much ado about nothing. The chief effect of the legislation would be to create much complicated machinery, capable of producing only delay and confusion in settlement of disputes which it was the avowed object of the Act to end with expeditious decision. We do not believe that Congress intended any such consequences.

As against these views, the extreme argument is made that Congress did intend the Act to provide nothing more, prior to institution of suit to enforce an award, than an elaborate and complicated method of private, voluntary negotiation. In this conception the Board becomes a mere private go-between, without arbitral or quasi-judicial powers, not a public institution. The argument ignores the language, purposes and effects of the statute, both in its administrative provisions and in those for judicial enforcement of awards. It disregards, too, the basic, progressive and integral structure of the statute.

The entire statutory process has three distinct and primary stages: (1) direct negotiation between the disputants; (2) administrative determination; (3) judicial enforcement.[12] While these are distinct, they are not independent. Each is related to the others as links in a chain or successive steps in a stairway leading to decision. The first stage is private and voluntary. The second is voluntary, though in our view not private. The third is public and we think exclusive, though not compulsory.[13] Despite these differences, each stage has special relation to and effects upon the other.

The language of the Act regarding the second phase is not that of private negotiation. Section 3 establishes the Adjustment Board and gives its first division "*jurisdiction* over disputes involving train- and yard-service employees." 45 U.S.C.A. § 153, First (h). The dispute is referred to the Board, after unsuccessful private negotiation, "by *petition* of the parties or by either *party*." Id.(i) Awards must be stated in writing and "shall be *final and binding* upon both parties" except as to

---

[11] According to statistics available in 1938, approximately one-third of the Board's awards were in favor of the carrier. Of a total of 3,134 decisions rendered, petitions were sustained in 1,745 cases, denied in 888, sustained in part in 394, and dismissed or remanded in 107. Spencer, The National Railroad Adjustment Board (1938) 50. Since the Act makes no provision for suit by the employee to set aside or review unfavorable awards, it is at least doubtful whether such a remedy exists. Cf. infra this opinion. If none exists, the carrier has the advantage, when successful before the Board, of a conclusive determination. If, on the contrary, the employee may have

review independently of the statute, it would be without benefit of the statutory advantages.

[12] The negotiating phase is covered by Sections 2 (First to Tenth), 3, First (i), 48 Stat. 1186, 1191, 45 U.S.C.A. §§ 152, 153, First (i) (1934); that of administrative determination by Sections 3, First (a–o), 48 Stat. 1189–92, 45 U.S.C.A. §§ 153, First (a–o) (1934); and that of judicial enforcement by Sections 3, First (p), (q), 48 Stat. 1192, 45 U.S.C.A. §§ 153, First (p), (q) (1934).

[13] The Act permits, but does not require, the employee to bring an enforcement suit. Section 3, First (p).

money awards[14] Id.(m). When the award favors the petitioner-employee, the Board must make "an *order*, directed to the carrier, to make the award effective." Id.(o). "Jurisdiction," "petition * * * by either party," "final and binding upon both parties," "an order, directed to the carrier," these are not words of polite suggestion. They are terms of duty, if not of force. They describe power and decision, not mere advisory intermediation. That is true though the Board has no power to enforce its orders otherwise than by decision. In that respect the awards and orders may be said to constitute a kind of administrative declaratory judgment. This view is consistent, too, as the other is not, with the Act's expressly declared objects, "to avoid any interruption to commerce * * * and to provide for *prompt* and orderly settlement of *all* disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U. S.C.A. § 151a. (Italics in this paragraph supplied)

▇ The enforcement provisions also show that the administrative phase is not merely advisory or simply "private negotiation." As has been shown, awards are given substantial legal effects in the enforcement phase. In addition to those mentioned previously awards favoring employees create causes of action in their favor. 45 U.S.C.A. § 153, First (q). Mere private go-betweens have no such power, unless they are agents.[15] It is true that the award is not a conclusive legal determination. That is true also of any decision, administrative or judicial, which is reviewable or determinable de novo by the courts. But that does not mean that the decision has no legal effect or that it amounts to mere private advice. If we assume that Congress could attach to the advisory action of mere private intermediaries the conse-

quences which it has given to awards favoring employees, their character is such as to make improbable its intention to do so. That it has done so indicates rather that it regarded the Board as a public agency performing public functions. There would have been no point in resorting to Congress to establish the Board and define its jurisdiction and powers if it had been intended to be a merely private agency and its functions merely advisory. That could have been done by private arrangements. And experience with the 1920 Act demonstrated that such procedures were a failure.

The view that the Board is a public agency doing public work derives support also from the long legislative history of the Railway Labor Acts.[16]

But it is said the decision in Moore v. Illinois Central R. Co., supra, and language of the opinion, establish that Congress intended the Board to be a private agency and its awards to have private, advisory character. This conclusion is drawn because, according to the opinion, the Railway Labor Acts have not been "based on a philosophy of legal compulsion," but were intended to create "a system for peaceful adjustment and mediation voluntary in its nature."[17]

▇ The argument confuses private quality with voluntary character. It also ignores the always present limitation upon judicial language imposed by the facts concerning which it is used. It is one thing to hold that Congress intended an administrative remedy to be voluntary in nature, not based upon a philosophy of legal compulsion. It is another, and entirely different one, to hold that it intended the remedy to be legally ineffective when resorted to voluntarily by the disputants. Keeping open the usual channels of judicial relief before the administrative procedure has been set in motion is entirely consistent with and

---

[14] This provision is qualified by the absence of provision for enforcement by the Board and by the provision of Section 3, First (p), that the findings and order shall be prima facie evidence of the facts stated, in the enforcement suit. Cf. note 36 infra.

[15] The Board is bi-partisan, 45 U.S.C. § 153, First (a), as are its divisions [Id. (h)], and the members are paid by the parties who select them. But awards can be made only by a majority and, when the members deadlock, a referee participates to break it. There is, of

course, something of partisan representation, but it is not that of private agency. The Board and its divisions act in their official capacities when making awards. Cf. Final Report of the Attorney General's Committee on Administrative Procedure (1941) 185, 186.

[16] For this see Spencer, The National Railroad Adjustment Board (1938); Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency (1937) 46 Yale L. J. 567.

[17] 312 U.S. at pages 635, 636, 61 S.Ct. at page 756, 85 L.Ed. 1089.

fully satisfies the statutory scheme's voluntary character and absence of compulsion. Choice has its play for or against it. But when choice has been exercised and the statutory methods have been employed, it does not follow, from the statute or the Moore case, that Congress intended their consequences, declared by itself, to be wholly ignored by the parties or the courts as they might be if they were mere private advice or suggestion. The Moore decision holds that Congress has not compelled disputants to go before the Board. It does not hold that, having gone, they can disregard the award and its consequences at will. That would be too much to imply from the decision or the court's language. That language has full meaning when applied to the facts of that case. In our view it is perverted when fitted to the facts of this one.

 We think, therefore, that Congress intended the Board to be and to act as a public agency, not as a private go-between; its awards to have legal effect, not merely that of private advice. It intended the employees, when successful before the Board, to have definite and substantial probative and financial advantages in suits to enforce awards, which they cannot have in other suits. Because this is so, and because the Act gave the employees two years in which to sue for enforcement, we think Congress intended the courts during that period to keep hands off these controversies except in the manner specified in the Act. This would be true if it were necessary to regard the issue now presented as involving the existence of jurisdiction to entertain other forms of suit. It is equally true, when the issue is considered as presenting a question of sound judicial discretion in declining to exert jurisdiction, more especially since this is a suit for a declaratory judgment. To permit maintenance of this suit would short-circuit both the administrative proceeding and the special statutory suit. It would make the Railway Labor Act a dead letter so far as legal effect is concerned, perhaps also as a "voluntary, private system of negotiation." [18] So far as the intention of Congress goes, there-

fore, we cannot believe these results were contemplated.

## II.

 It remains to consider the constitutional questions. They are closely related to those concerning Congress' intent. It is argued that the Act must be construed as creating merely a private, nonobligatory system of negotiation, because otherwise considered the administrative procedure is wanting in the essentials of due process of law and the remedy afforded the employer by defense to the employee's enforcement suit is inadequate. Thus it is said that to give the Act the effect of preventing the maintenance of the present suit will deny to the carrier constitutionally guaranteed protection of its rights.

Much of the argument has been built around the alleged inadequacy of the administrative proceeding as complying with the requirements of due process, particularly in the absence of formal pleadings, opportunity for examining witnesses and cross examining them, opportunity for representation by counsel and for oral argument. These things would be important, if the Board's decisions were final in the legal sense and for purposes of enforcement, as to either facts or law. But, as has been shown, they have no such quality. Though the effects of an award favorable to an employee are substantial, they do not conclude the employer's rights. The Board cannot enforce its awards. That is left for the courts to do. It can be done only in a suit de novo.[19] In the suit the cause of action is upon the award, to secure its enforcement. But the parties are not limited by its provisions in the trial. The employee must set forth "the causes for which he claims relief" and the Board's order. 45 U.S.C.A. § 153, First (p). The suit must "proceed in all respects as other civil suits," except that the order and findings "shall be prima facie evidence of the facts therein stated." Ibid. The carrier is limited in no way as to its defenses or the evidence it may wish to present. Its day in court in the enforcement suit is a full one. That is hardly disputed. The short answer, therefore, to the argument

---

[18] It is doubtful whether parties would resort to a procedure which could be discarded at any moment without some adverse legal effect. In that event, the only certain result would be delay in the final settlement.

[19] Because of its prima facie factual effect, the award may give the suit something more than the character of a normal suit de novo. But the suit may be classified thus more accurately than as one for review proper.

that the administrative proceeding is wanting in due process is that, if so, this is entirely immaterial.[20] Any failure in this respect is cured by the full and complete opportunity which the carrier is given in the enforcement suit to make its defense under all procedural and substantive guaranties of the Constitution.[21]

That is true, unless, as plaintiff contends, the fact that its day in court under the statute is one of defense rather than offense, or both, renders its remedy or protection inadequate. It complains that the statute balances the scales of justice unevenly by permitting the employees to sue and not giving to itself the same right.

If the statute creates inequality in this respect, it is perhaps the other way. When an award is unfavorable to an employee, the statute makes no provision for him to challenge it by suit to set it aside or otherwise. So far as appears from the Act's explicit terms, the Board's decision is final. We need not determine whether the statute is conclusive in this respect or, if so, whether it would be so far invalid. In other words, the question is not before us whether an employee can maintain a suit for relief independent of the statute and of the award, after he has submitted his case to the Board and received its adverse decision. That the statute, if applied literally in this respect, might be invalid as to the employee and that he might therefore have independent relief, does not mean that it would be invalid as to the carrier or that it should have such relief from the Board's adverse decision. Their situations are entirely different and so are the effects upon their rights of the award and of absence of opportunity to institute suit to review it. The employee's rights would be foreclosed, if the award against him were

---

[20] Cf. note 32 infra. See also the enforcement suit provisions of the Federal Trade Commission Act, Sections 9 and 10, 38 Stat. 723, 15 U.S.C.A. §§ 49, 50, held to provide adequate, and as we construe the decisions, exclusive, remedies in Federal Trade Commission v. Claire Furnace Co., 1927, 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978, and Federal Trade Commission v. Maynard Coal Co., 1927, 57 App.D.C. 297, 22 F.2d 873. In our view, the enforcement procedure prescribed by Sections 9 and 10 of the Federal Trade Commission Act is not distinguishable from that presently involved, either by the fact that in the former the suit was instituted by the Attorney General, in his discretion and at the request of the Commission, or by the fact that the orders were to file reports with it rather than *decisions* concerning contract rights and adjustment of private disputes. As to the first asserted ground of distinction, the Attorney General's discretion was a limitation upon the Commission's power to institute the enforcement suit, not a grant of power to the complainant to set it aside. Plaintiff complains here, not because defendant can institute the enforcement suit or because his power to do so is not limited by a discretion given to a public official, but because it is not given the right to sue to set aside the award. As to the second ground, it may be doubted whether persons are entitled to greater protection, in the constitutional sense, respecting contract rights and disputes concerning them than they are with respect to inquisition concerning private business affairs and possible publication of the information derived from it.

Except in respect to the initiative in litigation, analogies to the enforcement procedure presently before us may be found in the procedure prescribed by Section 4915, R.S., 35 U.S.C.A. § 63, for obtaining a patent, in which the issues are triable de novo on all the competent evidence, General Talking Pictures Corp. v. American Tri-Ergon Corp., 3 Cir., 1938, 96 F.2d 800, but the adverse decisions of the Patent Office, by reason of its expert technical knowledge, are entitled to great weight, Abbott v. Coe, 1939, 71 App.D.C. 195, 109 F.2d 449; and also in proceedings before the Board of Tax Appeals, in which the determination of facts by the Commissioner of Internal Revenue is regarded as prima facie correct. Flynn v. Commissioner of Internal Revenue, 5 Cir., 1935, 77 F.2d 180; Mente v. Commissioner of Internal Revenue, 5 Cir., 1935, 76 F.2d 965; Green's Advertising Agency v. Blair, 9 Cir., 1929, 31 F.2d 96; cf. Phillips v. Commissioner of Internal Revenue, 1931, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289.

[21] Cf. Nickey v. Mississippi, 1934, 292 U.S. 393, 54 S.Ct. 753, 78 L.Ed. 1323; Pike v. Walker, 1941, 73 App.D.C. 289, 121 F.2d 37; Montana Power Co. v. Public Service Commission, D.C.Mont.1935, 12 F.Supp. 946, reversed on other grounds, Mountain States Power Co. v. Public Service Comm., 1936, 299 U.S. 167, 57 S.Ct. 168, 81 L.Ed. 99; Cook v. Des Moines Union Ry., D.C.S.D.Iowa 1936, 16 F.Supp. 810; 16 C.J.S., Constitutional Law, § 628, p. 1280. See also Crowell v. Benson, 1932, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598.

final. The employer's position, on the other hand, is much different.

And in this lies a stronger answer. It is the fact that unless the employee institutes an enforcement suit, the carrier cannot be prejudiced in any legal sense by the absence of an opportunity to sue. The only purpose of such a suit would be to set aside or nullify the award. But this is not necessary for adequate protection of the carrier's rights. The award is not self-enforcing or enforceable by the Board. It is merely a decision that the carrier should change its operating practice in the manner specified. It has the power of management and if it regards the award as contrary to its rights it can maintain the existing practices. The Act confers upon the employer the powerful advantage of defensive position in respect to the award. It places the burden of enforcement upon the employee. It limits the time within which he may act. The period allowed is not unreasonable. If he does not act within it, presumably his right to do so is gone.[22] If not, he loses at any rate the special advantages of the statutory suit.

In all this there is no essential unfairness. Certainly there is none beyond the power of Congress to create in the regulation of such complex economic matters. The carrier is at full liberty to accept and comply with the award, or to reject and disregard it. If it chooses the latter course, the award has no effect upon its rights unless the employee institutes and succeeds in a suit to enforce it. If he does so, the carrier receives full constitutional protection in the suit.

A further argument remains. It is that unless the carrier can maintain such a suit as this, the employees will elect not to institute enforcement suits, but to rely upon their economic bargaining power, that is, the right to strike, to secure enforcement or acceptance of awards. Thus, it is said, the carrier will be deprived of its day of defense, and so of its only day in court. It is urged that the court should look at the facts of industrial and railroad life and determine the effects of the statutory provision for suit in their light. If that is done, the further fact cannot be ignored that carriers, as well as labor unions and employees, have economic bargaining power. They are not entirely defenseless in the face of threat of strike. Nor are railroad strikes so easily and readily called and put in effect that they are everyday occurrences. Employees, as well as employers, have a stake in avoiding them.[23] And there is elaborate provision in Section 2 of the Act for meeting the contingency of a strike.

There is nothing to show that the consequence feared will follow, except the unsupported and argumentative assertion that it will and the fact that few enforcement suits have been instituted.[24] This might mean that the carrier supinely accepts all adverse decisions of the Board, though believing them erroneous. On the other hand, it may mean that the Board has done its work well or with reasonable satisfaction to the disputants.[25] That this

---

[22] Otherwise the limitation of Section 3, First (q), 45 U.S.C. § 153, First (q), would be meaningless. It is not contended that the remedy afforded the employee when the award is in his favor is inadequate. It may have been the philosophy of the Act to provide a reasonable period for litigation following the award and when that has passed to make an end of the whole matter by barring the employee's asserted claims.

[23] Cf. Spencer, op. cit. supra note 11, at 64: "It is true, of course, that the controversies over which the Board has jurisdiction are not of such a character, generally speaking, that they produce strikes and other serious consequences. At the same time an accumulation of these minor controversies which cannot be settled quickly and equitably tends to breed suspicion and distrust on the part of employees, and, of course, may result in major controversies." The major causes of strikes, i. e., those involving questions of representation for collective bargaining, making of collective agreements, etc., are committed to the Mediation Board rather than the Adjustment Board, by Section 2 of the Act. Cf. Spencer, op. cit. supra, at 30.

[24] So far as we have discovered the only reported case thus far brought to enforce an award is Estes v. Union Terminal Co., 5 Cir., 1937, 89 F.2d 768. It is understood that other cases are now pending in the courts to secure enforcement.

[25] Cf. Garrison, op. cit. supra note 10, at 592, 593. See also Final Report of the Attorney General's Committee on Administrative Procedure (1941) 185–8; Spencer, op. cit. supra note 11, 49 ff., 63; Administrative Procedure in Government Agencies, Sen. Doc. No. 10, Part IV, 77th Cong., 1st Sess. (1941).

may be true is shown to. some extent by the fact that a large percentage of its decisions have been favorable to the carrier.[26] The provisions for majority vote of the bi-partisan Board and for selection of referees in cases of deadlock go far to assure fair hearing and decision. It is entirely possible that both carriers and employees prefer acceptance of decisions so rendered to incurring the heavy expense and long delay incident ordinarily to final judicial decision in enforcement suits.[27] It is not alleged that strikes or threats of strike to secure employees' demands of this character have been more frequent than they were before the amendments of 1934 which created the National Railway Adjustment Board and its procedures.

 Finally, even if the argument were more persuasive factually, it is hardly sufficient to establish the unconstitutionality of the legislation. The Railway Labor Act was designed, not to outlaw the right to strike, but merely to prevent the necessity for its exercise. That it has done, as the results attest.[28] The argument assumes that a strike, or threat of one, to secure acceptance of an award would be unlawful. That it would be so has not been established, and the question need not now be determined.[29] Whether such action would be lawful ,or unlawful, the mere possibility that employees may resort to it rather than to suit is not enough to make the latter inadequate constitutionally as protection for the carrier's rights. The weight of that possibility is properly within the discretion of Congress in determining whether the initiative in litigation shall be given to one party or the other, particularly where

as here it has given no final or conclusive effect, as against the party put upon the defensive, to the cause of action to be asserted. The fact that one party to a dispute which is litigable may undertake to settle it illegally does not render a legal remedy, adequate within itself, inadequate.

It is urged also that the statutory suit is inadequate because, if no other remedy is available, the employer will face a dilemma, namely, to obey the award, thereby risking a suit for breach of contract by the tenant lines' road engine crews; or to disobey it, thus incurring the risk of having to pay both the road engine crews for doing the work or for not letting them do it and defendants' accumulated demands for the same work, though they will not have done it. Accordingly, plaintiff says it must build up a large fund to guard against these contingencies and should be relieved from this burden.

We are not impressed with the force of the argument as establishing either the constitutional inadequacy of the enforcement suit or (since the two come to substantially the same thing in these circumstances) the intention of Congress not to make it exclusive.

In the first place, if we assume that the dilemma is presented in the full force of plaintiff's statement, we do not agree that permitting plaintiff to maintain the present suit would give it certain escape. The contrary argument assumes that the decision on the merits would be in plaintiff's favor and would be rendered more promptly than plaintiff could secure final determination of its rights under the provisions of the Railway Labor Act. Neither assumption can

---

[26] Cf. note 11 supra.

[27] For instance, Moore v. Illinois Central R. Co., 1941, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, though not an enforcement suit, illustrates the possibilities for delay in judicial disposition of these controversies. The litigation originated in the state courts of Mississippi in October, 1932, though the suit in which that decision was rendered was not begun until 1936. Since then, through nine years, it has wended its tortuous way, back and forth through state and · federal courts, until it reached the Supreme Court and was decided on March 31, 1941. Now it is on its way back again for another round. This circle of litigation, reminiscent of that pointed out in the dissent in McCart v. Indianapolis Water Co., 1938, 302 U.S. 419, 423, 437, 58 S.Ct. 324, 82

L.Ed. 336, hardly comports with the promptness required by purposes of the Railway Labor Act as stated in Section 2, though it may afford a maximum of orderliness. The present litigation might be cited also to the same effect.

[28] It is not alleged that any strike has been instituted to enforce an award. In one instance a strike ballot was taken. Garrison, op. cit. supra note 10, at 591, note 94. See also First Annual Report of the National Mediation Board (1935) 29; Second Annual Report (1936) 34.

[29] Possibly the answer would depend on whether the award conforms to the employees' rights as finally determined judicially. If so, and the two should coincide, the strike would not be unlawful.

be made. Of course, defendants' claims would be disposed of and the dilemma would be resolved by a decision in plaintiff's favor. But it is hardly probable that this could be accomplished in the ordinary course of litigation within the two years allowed the employee to bring his enforcement suit.[30] After that time the statutory bar against his suit would appear to make recourse to the courts by the carrier unnecessary.[31] We cannot assume that the decision on the merits would be in the employer's favor. If it were otherwise, it is true that the rights existing under the contract would be adjudicated as between the plaintiff and the defendants. But that would not be true as to any rights of the tenant lines' crews against the plaintiff. They are not parties to this suit, the collective agreement or the award. The contract or arrangement under which they do the disputed work is not in evidence or in issue. Their rights, therefore, could not be determined in this suit. Cf. Nord v. Griffin, 7 Cir., 1936, 86 F.2d 481. Consequently, a decision in favor of the defendants could not relieve the plaintiff from its dilemma. The tenant lines' crews could assert their claims in other litigation. It is therefore highly questionable whether permitting plaintiff to have declaratory relief would give it a more prompt and certain escape than is afforded under the Railway Labor Act. If the enforcement procedure, including the statutory bar, is inadequate for failure to afford relief from the dilemma, the declaratory judgment suit, as it is sought to be maintained here, is hardly less so. Constitutional inadequacy of one remedy is not cured by substitution of another which is equally inadequate or substantially so.

But we do not believe the dilemma is as strong as plaintiff makes it appear. The record does not show that it is under any contractual obligation to the tenant lines or their employees to have the latter perform the work. As the dissenting opinion points out, it may be inferred from statements in the pleadings and the briefs on appeal that the expense of the service done by the train crews is borne by the plaintiff. But it is not shown that this is pursuant to any contract which gives them the right to do this work. It appears merely that there has been a *"practice* to keep a strict accounting between the parties of the amount and value of such services, and periodically the plaintiff is required to pay, and does pay *to the Tenant Lines,* sums equal to the reasonable value of said services." (Italics supplied.) It does not appear that the tenant lines' employees have any personal claims against the plaintiff or that they or the tenant lines themselves have any contractual right to do or continue doing this work. The largest permissible inference is that the tenant lines have a right, under the practice which has been followed, to be reimbursed by plaintiff for the value of the services actually rendered by their employees. On the record before us plaintiff could change its operating practice at will and without further liability than to pay the tenant lines the value of the work done prior to the change. The supposed dilemma, therefore, is not one created by inconsistent contractual obligations giving others the right to do the work or serious probability that they will be asserted. It is entirely immaterial that the work has been done by the tenant lines rather than by plaintiff in some other way. Whether it is done by plaintiff itself or by others, plaintiff must bear its cost. That is an inevitable consequence of its decision not to put the award into effect. So is the risk that the employee may succeed in an enforcement suit and thus subject plaintiff to possible liability for damages for breach of the collective agreement.

The dilemma therefore boils down to the fact that plaintiff will have to bear the expense of having the work done, consequent to its own election not to accept the award, and, if an employee succeeds in an enforcement suit, whatever damages for breach of the collective agreement may be claimed and proved. These consequences of its election to maintain the status quo cannot have been without the contemplation of Congress when it adopted the enforcement procedure. They hardly present the difficulties which would arise from independent agreements allocating the work to different persons or groups. We do not think the enforcement procedure is made constitutionally inadequate merely because the carrier prefers, as is its right, not to put the award in force, but to follow an advantageous practice which it could change at will and, consequently, to incur the necessary expense of doing so.

---

[30] Cf. note 27 supra.

[31] Cf. note 22 supra.

■ **249**

■ But, if it were shown that the carrier had bound itself by conflicting contracts allocating the work, and thus the dilemma were complete, it would not follow that the enforcement suit is inadequate or was not intended to be exclusive or that declaratory relief would be appropriate. We know of no constitutional protection against the consequences of making inconsistent contracts concerning the same subject matter nor of any which renders inadequate a proceeding, otherwise sufficient, merely because others not parties to it may assert claims inconsistent with its result and perhaps succeed in sustaining them by independent litigation. The risk of multiple liability, that is, the possibility that two or more claimants may assert, severally and independently, similar causes of action covering identical subject matter, is an everyday occurrence. That risk presents a common and peculiarly appropriate situation for declaratory relief when it can remove the risk and other adequate relief is not available. But so to apply the declaratory judgment procedure is vastly different from applying it where, as here, it could not remove the risk and where it would displace a special remedy provided for decision of highly complex and specialized questions. The primary purpose of the Declaratory Judgments Act is to give relief in situations in which it was not previously available, not to displace existing and, particularly, special remedies devised for peculiar situations. Nor is it intended to remove all risk of multiple liability. That, unfortunately, is a function not covered as yet by legal invention.

Finally, if it were clear that allowing plaintiff to maintain this suit would eliminate or minimize its risk of multiple liability, that advantage to plaintiff still would have to be weighed against the corresponding disadvantages created for the employees and the adverse effects upon the whole statutory plan. Plaintiff's disadvantage under that plan comes down to having the initiative in litigation concerning awards given to the employees for two years. That price hardly seems unreasonable for Congress to exact in exchange for the strong defensive position given the employer with respect to the award and the prompt disposition of disputes which the Act has made possible. The statute denies the employee the more usual advantages of administrative decision, namely, im-

mediate effectiveness unless stay is secured, limitation of judicial review to questions of law, enforcement by public authority, etc. It gives him only decision, not action, by the Board. It puts upon him the whole burden of enforcement. In view of all these relative advantages and disadvantages, we find no essential unfairness in leaving to the employee the decision whether the award shall be enforced and limiting the period in which his decision can be made to two years. Certainly there is no discrimination beyond the power of Congress to create. Suspension of the carrier's initiative in litigation for that period of time is not an infringement of constitutional right. As we have said, to hold otherwise would disrupt the working of the Railway Labor Act, as well as deprive the employee of the statutory special advantages in the enforcement suit. These consequences forbid the implication that Congress intended them.

■ The foregoing considerations are reinforced by the fact that the carrier, under the decision in Moore v. Illinois Central R. R., supra, can bring its suit on the contract, independently of the statute, prior to the time when the dispute is submitted to the Board. Until then, at least, it has its election to pursue the exclusively judicial remedy or to follow the administrative and judicial one provided by the Railway Labor Act. When it chooses the latter, we think it is bound to follow it through to the conclusion prescribed by the statute. Such a choice is made, we think, not only when the carrier submits or joins in submitting the dispute to the Board, but, when under submission by an employee, it appears before the Board and participates in a full hearing on the merits. Having done these things, had the chance of a favorable decision, and finally, when it has lost, been confronted only with an order not enforceable except by a suit which has not been brought, which it seeks in effect to forestall by this one, and in which, if begun, it would have had a full day in court, plaintiff cannot complain that it has not had complete opportunity to protect it rights or that they have not been protected adequately.

■ What plaintiff attacks, fundamentally, is the whole idea of the enforcement suit plan. The provisions for the enforcement suit are unusual. Some of the features of the administrative phase of the statute are unique. But enforcement suits

are not unknown,[32] and neither the fact that they are unusual nor the other that the administrative provisions and procedure are unique renders the Act unconstitutional. It is the total effect of the two phases, not the segmented effect of the first, which must determine that question. The administrative phase has been criticized. On the other hand, it has been commended. No doubt there is room for considerable improvement.[33] But these matters are for Congress' judgment. The present Act has evolved from a long legislative history. Many of its unique features are derived for that.[34] Though the administrative features are frankly not in the accustomed traditions and methods of courts and lawyers,[35] the enforcement suit follows them except possibly as to the initiative in litigation. That it may not do so in this single

respect does not, as has been shown, deprive the carrier of legal protection according to due process of law.

■ Nor does it that Congress may have intended to discourage resort to the courts for enforcement of awards and settlement of these disputes after the initial stages of private negotiation and administrative decision, thus securing the prompt disposition which the Act avowedly sought.[36] If that was Congress' intent, its constitutional power over the jurisdiction of the federal court sustains it both in providing the remedy which it has given and in excluding others. Though some of them were decided before, and at least one after the Moore decision was rendered, the decisions cited below, or their implications, appear to bear this out.[37]

---

[32] Cf. Sections 16(1), 16(2) of the Interstate Commerce Act, 34 Stat. 590 (1906), as amended by 36 Stat. 554 (1910) and 41 Stat. 491 (1920), 49 U.S.C. § 16(1, 2), and Section 309 (f) Packers and Stockyards Act, 42 Stat. 166, 7 U.S.C. § 210(f) (1921). As to the former, see Brady v. Interstate Commerce Commission, D.C.N.D.W.Va.1930, 43 F.2d 847, affirmed, Brady v. United States, 1931, 283 U.S. 804, 51 S.Ct. 559, 75 L.Ed. 1424; Baltimore & O. R. Co. v. United States, 3 Cir., 1937, 87 F.2d 605; Baltimore & O. R. Co. v. Brady, 1933, 288 U.S. 448, 53 S.Ct. 441, 77 L.Ed. 888, in the last of which the Court held that claimant, having elected to pursue his administrative remedy before the Commission, was not entitled to recover more than the amount of the award, though he might have done so by suing originally in the district court. See also Meeker v. Lehigh Valley R. Co., 1915, 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644, Ann.Cas. 1916B, 691, and St. Louis & S. F. R. Co. v. Spiller, 1927, 275 U.S. 156, 48 S.Ct. 96, 72 L.Ed. 214; Minds v. Pennsylvania R. Co., D.C.E.D.Pa., 1916, 237 F. 267, 270, affirmed, 3 Cir., 1917, 244 F. 53, and 1919, 250 U.S. 368, 39 S.Ct. 531, 63 L.Ed. 1039. Compare note 20, supra.

[33] Cf. Garrison, op. cit. supra, note 10, at 593–598; and the guarded recommendations of the Attorney General's Committee on Administrative Procedure, Final Report (1941) 185–188.

[34] Cf. Spencer, op. cit. supra, note 11, at 8–12; Garrison, op. cit. supra, note 10, at 568–576; and the Final Report, cited in the preceding note, at 185.

[35] Cf. Garrison, op. cit. supra, note 10, at 598: "It is difficult to conceive of the Board's being able to discharge its func-

tions under any set-up which would fit within these traditional legal concepts."

[36] Cf. Meeker v. Lehigh Valley R. Co., 1915, 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644, Ann.Cas.1916B, 691; St. Louis & S. F. R. Co. v. Spiller, 1927, 275 U.S. 156, 48 S.Ct. 96, 72 L.Ed. 214. In Cook v. Des Moines Union Ry., D.C.S.D.Iowa 1936, 16 F.Supp. 810, 813, Dewey, District Judge, said, with reference to the provision of the Act that the award "shall be final and binding upon both parties": "It is unnecessary to determine whether or not this might be a depriving of due process in certain cases * * *. The purport of the act may be to provide that the award made by an Adjustment Board shall be final so long as it is not attempted to be enforced. * * * Therefore there is no deprivation * * * of any rights unless and until the suit is filed in the District Court * * *. When this is done it becomes an action at law with the right of a jury. The entire case is open for trial as a law action on the original suit."

[37] See Railroad Yardmasters of North America v. Pittsburgh & Lake Erie R. Co., D.C.N.D.Ohio 1940, 39 F.Supp. 876. See also Adams v. New York, Chicago & St. L. R. Co., 7 Cir., 1941, 121 F.2d 808, decided after the decision in the Moore case was rendered, and distinguishing Nord v. Griffin, 7 Cir., 1936, 86 F.2d 481. However, on June 24, 1941, the opinion was withdrawn, to the extent that it conflicted with the Moore decision, and a judgment of reversal was substituted for the previous one affirming the action of the District Court in refusing to exercise declaratory jurisdiction, 1941, 121 F.2d 808.

Finally, this is a suit for a declaratory judgment. The remedy is discretionary.[38] We do not believe a carrier, consistently with the Railway Labor Act, could maintain a suit in equity to set aside an award or enjoin its enforcement. The statute seems clearly to exclude such suits by specifying enforcement suits solely as a method of review, and the absence of reported cases showing attempts to maintain other types of suit supports this view. The declaratory action has much of equitable quality in regard to the discretion which should be exercised in allowing relief. Its effect here, if plaintiff should be successful, would be substantially the same as setting aside the award or enjoining enforcement. Consequently, we can see no valid reason for excluding these remedies which does not apply with equal force to that by declaratory judgment, whether as a matter of congressional intent or one of judicial discretion in allowing that relief. To allow it also would deprive the employee of his special advantages in litigation. It would displace another, and in our view, an adequate judicial remedy specially devised for the particular situation. When this is the effect, courts generally deny declaratory relief.[39] The doctrine of "primary jurisdiction" [See Note (1938) 51 Harv.L.Rev. 1251] and considerations of comity toward a specialized administrative tribunal charged to deal with such matters lend weight to the view that it should be denied in these circumstances. The former has been applied most frequently when the administrative body has exclusive jurisdiction, or where exhaustion of the administrative remedy is required, to prevent the suit from being premature or to give the court the benefit of the administrative judgment in advance of its own action. The present case is one appropriate for the same attitude, even though it was not regarded as appropriate for the situation in Moore v. Illinois Central R. R., supra. Furthermore, the railroad employees who are now doing the disputed work, or their union representatives, have not been made parties to the action. Their rights may be affected by the result. In these circumstances also declaratory relief ordinarily is refused.[40] All these considerations apply not only to show the intention of Congress, but also to guide the court's discretion toward denial of declaratory relief.

The reasons we have stated support the view that the court did not have jurisdiction to entertain the present suit. But, whether or not it had jurisdiction, the action was premature. For practical purposes it matters little whether one or the other reason constitutes the basis for decision. The important thing is that the statute gave the initiative in litigation to review the award to the employee for two years. For disposing of this case, it is immaterial whether this amounted to a mere suspension, for that period, of the employer's right to sue or was intended, with other provisions of the Act, to bar it altogether. It seems clear that the limitation upon the employee's right to sue was intended to bar action by him after the two years expire; otherwise it would be meaningless.[41] That being true, his failure to sue within the time might be regarded reasonably as disposing finally of his claims determined by the award. Correspondingly, it might be held, with reason, that there would be no need for suit by the carrier after that time, and therefore that the court was deprived of jurisdiction. But we need not and do not decide whether either the employee or the employer could sue after expiration of the two years. The facts do not present these questions. But, in any event, if it is assumed that the employer may wait until the period of limitations has passed and then bring its action, its right to bring it within that time is clearly barred. If that were not true the statute would be meaningless in giving the employee the initiative in litigation and the special statutory advantages, as well as in placing a limitation upon the time for his suit.

There is no escape from this conclusion in the assertion that this suit is one to enforce rights arising under the original agreement, not to review or nullify the award, and therefore the statutory bar or suspension does not operate against it. As we have said, the fundamental issue presented in this action is identical with that determined by the award and with that which would be decided by an enforcement suit, namely, whether the employees have

---

[38] Cf. Borchard, Declaratory Judgments, 2d Ed. 1941, 293–314.

[39] Id. at 342–346, and authorities cited; 16 Am.Jur. 295, § 21.

[40] Cf. Borchard, op. cit. supra note 38, at 255, 299, 304. See also Section 6, Uniform Declaratory Judgments Act.

[41] Cf. note 22 supra.

the right under the contract to do the work in dispute. That issue cannot be decided in independent litigation and in favor of plaintiff without nullifying the award and the consequences which the statute attaches to it in the enforcement suit. To assert therefore that the only rights involved in this suit are rights arising at common law under the contract, and that the rights given to the employee by the statute are not affected or involved, is either to beg the question or to ignore the inescapable effects of this suit, and the relief it would afford, upon the latter. What the plaintiff really seeks to do is to have all of the advantage of the statutory plan up to the point of the award and enforcement, and to escape from its disadvantages thereafter. We do not think it is so entitled to have its legal cake and eat it too.

Limiting the decision therefore squarely to the facts and the issues which they present, we find no constitutional inadequacy in the protection afforded to the plaintiff under the provisions of the Railway Labor Act, merely by reason of the fact that its right to initiate litigation to nullify an award is barred or suspended for a period of two years.

The judgment is affirmed.

STEPHENS, Associate Justice (dissenting).

This is an appeal from an order of the District Court of the United States for the District of Columbia dismissing the complaint of the appellant. The complaint was for a declaration, under the powers given United States courts by the Declaratory Judgments Act (Act of June 14, 1934, 48 Stat. 955, as amended by Act of August 30, 1935, 49 Stat. 1027), of the rights of the appellant and the appellees under a certain collective bargaining contract of February 1, 1923. The appellees, defendants below, filed an answer setting up three defenses. The first was that the complaint failed to state a cause of action, the second, that it did not state a cause of action appropriate for the granting of a declaratory judgment. [1] The court below considered these two defenses as in the nature of a motion to dismiss and its dismissal of the complaint was upon such motion. In view of the disposition of the case on the first and second defenses, the third defense was not considered. The case is thus before the court upon the facts set forth in the complaint as admitted by the first two defenses treated as a motion to dismiss. These facts are set forth in detail in the margin. [2] Stated in

---

[1] More particularly, the second defense said that the allegations of the complaint did not state a cause of action appropriate for the granting of the declaratory judgment against the defendants because:

"(1) The complaint fails to show the existence of an actual controversy between the plaintiff and the defendants.

"(2) The complaint affirmatively shows that there exists a remedy specially provided by statute for this type of case.

"(3) The complaint affirmatively shows that the purpose of the plaintiff in filing this action was to secure a judicial review of a decision of an administrative board, a purpose not contemplated by, nor permitted under, the Declaratory Judgments Act.

"(4) The complaint fails to show the existence of any statute or order about to be enforced against the plaintiff, or from the enforcement of which any damage will result to the plaintiff."

[2] 1. The appellant Washington Terminal Company is a corporation which has since 1907 operated the Union Passenger Station, a union railroad terminal, hereinafter sometimes called the station or the Terminal (where the word "station" is used it refers to the passenger station building and sheds proper) in the District

of Columbia. The appellees are employees of the appellant performing services in the Terminal as enginemen or firemen on yard engines used in switching service.

2. The appellant itself operates no passenger trains and employs directly no road engine or road train crews. All passenger trains which use the Terminal are operated by one or more of certain railroad companies known as the Tenant Lines, to wit, the Pennsylvania Railroad Company, the Baltimore and Ohio Railroad Company, the Southern Railway Company, the Richmond, Fredericksburg & Potomac Railroad Company, and the Chesapeake and Ohio Railway Company. The trains operate for the major portion of their runs on the tracks of one or more of the Tenant Lines between Washington and various other cities, and they use the tracks and facilities of the appellant for only a short distance in entering and leaving the Terminal.

3. The movement of loaded passenger trains from points outside of Washington into the Terminal, from the Terminal to points outside of Washington, and through the Terminal from points outside of Washington to other points outside, is performed and has always been performed

general and summary terms they are as follows:

The appellant is a corporation which since 1907 has operated the Union Passenger Station, including an adjacent railroad yard and tracks, hereinafter sometimes called the Terminal, in Washington, District of Columbia. The appellees are en-

since the opening of the Terminal exclusively by road engines manned by road engine crews of the Tenant Lines.

4. When passenger trains begin or end their runs at Washington, such road engine crews are and have always been required by the Tenant Lines to deliver the road engine to the enginehouse at the end of a run and to bring the road engine from the enginehouse to the station at the commencement of a run. Thus the road engines when so operated over the appellant's tracks between the passenger station and the enginehouse are and always have been manned by the Tenant Lines' road engine crews.

5. In addition to the movement of loaded passenger trains into, out of, and through the Terminal, certain other movements of equipment take place over the tracks of the appellant as follows: Empty passenger trains which have discharged their passengers at the station are moved to the storage yard; trains of empty passenger cars are moved from the storage yard to the station for the purpose of taking on passengers and leaving for their destination; where trains of passenger cars have come into the station one or more cars are sometimes cut off from the head end of the train and removed in a single movement to some designated track; where a train of passenger cars is standing in the station before departure one or more cars are sometimes moved from another track against the head end of such train and coupled on to form a part of the train on its journey over the road; when trains of passenger cars have come into the station and discharged their passengers, the empty trains are sometimes moved a sufficient distance to permit the road engine which has brought the train into the station to be uncoupled from the train and proceed by a cross-over movement to another track. Many movements of the kinds just described are and always have been, since the commencement of operation of the Terminal in 1907, performed, where in the judgment of the managing officers of the appellant efficiency or promptness in the operation of the Terminal is thereby promoted, by the use of the road engine which has brought the train into the Terminal or is about to haul such train to its destination, incidental to the movement of the road engine between the station and the enginehouse; and in making such movements the road engine is and always has been manned by the road en-

gine crew which is required as a part of its duties to deliver the road engine to the enginehouse at the completion of a run and to bring the road engine from the enginehouse to the station at the commencement of a run.

6. Movements over the tracks of the appellant other than those described in paragraphs 4 and 5 above are made and have generally been made by yard-engines of the appellant manned by yard-engine crews employed by the appellant.

7. On June 1, 1910, the appellant published certain rules and regulations for yard-engine firemen in its employ, defining the terms of employment and the rights of employees thereunder; on September 1, 1911, the appellant published certain rules and regulations for the government of yard enginemen in its employ, defining the terms of employment and the rights of the employees thereunder. These regulations separately defining the employment of yard firemen and yard enginemen were superseded on December 1, 1919, by a "Schedule of Rules and Rates of Pay for Enginemen, Firemen and Yardmen" entered into by and between the Director General of Railroads of the United States on behalf of the Washington Terminal Railroad (the appellant) and the enginemen, firemen and trainmen employed thereon represented by the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, and the Brotherhood of Railroad Trainmen, respectively. On February 1, 1923, the appellant entered into an agreement with the yard enginemen and yard firemen in its employ represented by the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen, respectively, entitled "Schedule of Rules and Rates of Pay for Enginemen and Firemen." This agreement remains and has remained in effect since its date as the only contract existing between the appellant and the enginemen and firemen in its employ, including the appellees, defining the terms of employment of enginemen and firemen. This agreement contains provisions establishing certain rights of seniority as between the appellant's employees belonging to each respective class covered by the regulations or schedules therein contained, these provisions among other things entitling the employees of a given class to vacancies and new runs in the order of seniority of the applicants therefor, providing for seniority as a factor in promotion, and

ginemen and firemen employed by the appellant who operate switch engines over the tracks in the yards. These yards and tracks and the passenger station are facilities used by the Pennsylvania Railroad Company, the Baltimore and Ohio Railroad Company, the Southern Railway Company, the Richmond, Fredericksburg & Potomac

according recognition in similar respects to length of service in a particular employment.

8. At the date when the regulations of June 1, 1910, went into effect and continuously thereafter during the period when the various regulations and schedules above referred to were successively in effect and continuously during the period since the schedule of February 1, 1923, has been in effect, the uniform and continuous usage and practice has been for movements of the character described in paragraph 5 above to be made by road engines manned by road engine crews of the Tenant Lines whenever in the judgment of the appellant's managing officials efficiency or promptness in the operation of the Terminal was thereby promoted; and a large proportion of such movements have always been and are being so performed by such road engines and road engine crews.

9. By Act of Congress of June 21, 1934 (48 Stat. 1185), entitled "An Act to amend the Railway Labor Act approved May 20, 1926, and to provide for the prompt disposition of disputes between carriers and their employees," there was established a board known as the "National Railroad Adjustment Board" with jurisdiction over disputes growing out of the interpretation or application of agreements between railroads and their employees concerning rates of pay, rules or working conditions, in the event that negotiations in respect of such disputes have failed to result in adjustment. The First Division (there are three others) of the Adjustment Board has jurisdiction over disputes involving yard and train service employees, including engineers, firemen, conductors, trainmen, and yard service employees. It consists of ten members, five designated by the carriers, and five by national labor unions of employees. Hereinafter sometimes this Division is referred to as the Board.

10. After the passage of the Railway Labor Act there was presented to the appellant by representatives of the firemen, enginemen and trainmen employed by it a claim to the effect that the work being performed on the property of the appellant by road engines manned by road engine crews of the Tenant Lines, as described in paragraph 5 above, was work to which yard engine crews of the appellant were exclusively entitled by reason of seniority rights under the agreement of February 1, 1923. After negotiations

between the appellant and representatives of the firemen, enginemen and trainmen had failed to result in agreement, the representatives, on March 29, 1937, invited the appellant to join with them in the submission of the claim to the Board. The appellant declined to do this on the ground that the claim was not based on violation of any agreement and amounted to a demand that operating practices should be abandoned which had existed continuously since the commencement of the operation of the Terminal. Notwithstanding such refusal by the appellant there was thereafter filed with the Board by representatives of the employees a claim reading in part as follows:

"It is the practice of The Washington Terminal Company to require tenant line road engines manned by tenant line road engine crews to move dead equipment from the depot to the coach yards, move dead equipment from the coach yards to the depot and perform other switching service on tracks of the Washington Terminal Company....Train and enginemen of the Washington Terminal Company claim that all such work should be performed by men holding seniority exclusively on the rails of the Terminal Company."

11. Thereafter within thirty days, pursuant to notification and requirement by the Board, the appellant filed its "submission" in answer to the claim, and at a date fixed by the Board the representatives of the employees and a representative of the appellant appeared before the Board at Chicago, Illinois. In accordance with the established procedure of the Board no witnesses were called to testify and no evidence was produced of the facts relied upon by the representatives of the employees in support of their claim, but these representatives made certain statements which were alleged to be facts and which were received by the Board without any opportunity being given to the appellant to cross-examine the representatives or otherwise to test the competency of their statements or to verify their existence as facts. At hearings before the Board the established procedure affords no opportunity to parties against whom claims have been filed to produce witnesses or by other means to introduce evidence in resisting the claims, and the procedure makes no provision for and does not permit the making of any record, stenographic or otherwise, of the proceedings before the Board. In accord-

Railroad Company, and the Chesapeake and Ohio Railway Company—called the Tenant Lines—operating passenger trains from points outside of Washington to Washington, from Washington to points outside, and from points outside through Washington to other points outside. In addition to the movement of loaded passenger trains

ance with this procedure no opportunity was given to the appellant to produce witnesses or by any other means to introduce evidence in resisting the claim presented by the representatives of the employees, and no record was made of the hearing.

12. Thereafter the Board was apparently unable to reach a determination of the claim, through deadlock or inability to secure a majority vote of the Board members, and, under the provisions of paragraph (1) of Section 3 of the Railway Labor Act, a referee was selected to determine the claim. In accordance with the established practice of the Board no opportunity was given to the appellant to appear before the referee and defend itself against the claim either by the presentation of evidence or oral or written argument, and the appellant was not notified by the Board that a referee had been designated to make an award.

13. Thereafter the referee decided the claim in favor of the employees and on October 24, 1938, this decision was adopted and published by the Board in a form consisting of a complete verbatim reproduction of the ex parte submissions of the employees and of the appellant respectively filed with the Board, followed by the words:

"FINDINGS: The First Division of the Adjustment Board, upon the whole record and all the evidence, finds that:

"The carrier or carriers and the employe or employes involved in this dispute are respectively carrier and employe within the meaning of the Railway Labor Act, as approved June 21, 1934.

"This Division of the Adjustment Board has jurisdiction over the dispute involved herein.

"The parties to said dispute were given due notice of hearing thereon.

"The work described in this docket is within the jurisdiction of the men holding seniority exclusively on the rails of the Washington Terminal Company.

AWARD

Claim sustained.

NATIONAL RAILROAD ADJUSTMENT BOARD
By order of First Division
Attest(s) T. S. McFarland
Secretary."

The Board served upon the appellant an "Order" "to make effective Award No. 3115, made by the First Division of the National Railroad Adjustment Board ... as therein set forth; and if the Award includes a requirement for the pay-

ment of money, to pay to the employee (or employees) the sum to which he is (or they are) entitled under the Award on or before November 23rd, 1938."

14. The appellant has not complied with the order, but since the date thereof movements of the character described in paragraph 5 above have continued to be made, where in the judgment of the managing officers of the appellant promptness or efficiency in the operation of the Terminal would be promoted, by road engines manned by road engine crews of the Tenant Lines. Accordingly, under paragraph (p) of Section 3 of the Railway Labor Act the employees or any of them, as firemen or enginemen employed by the appellant in the operation of its yard engines and therefore as persons for whose benefit the Board order was made, have been at all times since the date of the order, and are, authorized and empowered to file in the District Court of the United States for the District of Columbia or in the District Court of the United States for the district in which any one of such employees resides, a petition praying the court to make such order and enter such judgment as it may determine to be proper to enforce or set aside the order of the Board. But none of the employees has filed such a petition in the District Court of the United States for the District of Columbia or in any other District Court of the United States.

15. Notwithstanding that none of the employees has instituted any proceeding such as is referred to in paragraph 14 wherein the appellant would have opportunity and be entitled to show that the employees do not have any right under the contract of February 1, 1923, or otherwise, to perform movements of the character described in paragraph 5 above, and wherein the appellant might pray the court to set aside the order of the Board as unlawful, invalid and in excess of the jurisdiction of the Board, none-the-less the employees and each of them have, beginning November 23, 1938, presented, and are continuing to present, to the appellant claims and demands for sums of money other than the full day's wages which the employees earn for each day on which they actually do work. These demands are based upon the employees' alleged right to perform movements of the character described in paragraph 5 above, which they are not in fact performing but which are being performed by road engine crews of the Tenant Lines.

into, out of, and through the Terminal, certain other train or car movements—the right to make which is involved in this case —have since 1907 taken place and now take place over the tracks of the appellant: Empty passenger trains which have discharged their passengers at the station are moved to the storage yard; trains of empty passenger cars are moved from the storage yard to the station for the purpose of taking on passengers and leaving for their destination; where trains of passenger cars have come into the station one or more cars are sometimes cut off from the head end of the train and removed in a single movement to some designated track; where a train of passenger cars is standing in the station before departure one or more cars are some-

The demands so made by the employees are in the nature of claims for penalty payments and are in excess of the amounts which the employees would earn if they actually performed work of the character to which they claim they are entitled, many such demands being for another full day's pay in addition to the full day's pay which the claimants are already earning, the claim for such extra day's pay being based upon the fact that the claimant has not been given an opportunity to perform some one specific movement of the character mentioned in paragraph 5, the performance of which movement would involve only a few minutes work. These claims and demands are rapidly accumulating from day to day and amount for the period from November 23, 1938, to the date of filing the complaint (December 29, 1938) to a total of approximately $7,500, and are thus accumulating at the rate of approximately $80,000 per annum.

16. An actual controversy therefore exists between the appellant and the employees concerning their respective rights under the contract of February 1, 1923. This controversy resulted from the purported award of the Board of October 24, 1938, and comprehends the claims and demands, above described, upon the appellant for the payment of sums of money under the contract of February 1, 1923. The appellant is without an adequate and complete remedy at law in the premises and for want of such remedy is subjected to serious damage and inconvenience in this: There is no means by which the appellant can force or induce the employees or any of them to institute a judicial proceeding such as is referred to in paragraph 14. The Railway Labor Act provides no method whereby the appellant may petition any court of competent jurisdiction to set aside the award and order of the Board, and meanwhile the demands for money payments made by the employees are accruing and accumulating in the large amounts described. Although the issues, upon the determination of which the validity of the demands and the liability of the appellant to satisfy them depend, are as a matter of evidence and proof capable of present determination, the appellant, by reason of there being no judicial determination of its liabilities with respect to the demands, is compelled to maintain and make available substantial amounts of money to satisfy the demands in the event that the employees or any of them should subsequently institute legal proceedings to enforce the award and order, and in the event that it should in such proceedings be determined that the appellant is legally liable to pay the demands. If advised at the present time by proper judicial construction of its rights and liabilities under its contract with the employees, the appellant would, if necessary, be enabled, by making readjustments of its operating arrangements, to fulfill its obligations to the employees at less expense than by incurring the heavy penalty payments which the employees are now demanding. So long as the employees continue to make such demands without instituting legal proceedings wherein the validity of their demands can be adjudicated, and so long as the present controversy between the appellant and the employees with respect to their respective rights and liabilities under the contract remains without judicial determination, a serious impediment exists to the proper and adequate fulfillment of the appellant's obligation to serve the public which may, as a result of delay in securing an adjudication that will settle the controversy, ultimately impair and interrupt the performance of such service. By reason of each and all the facts set forth above the only remedy of the appellant, in order to avoid irreparable injury and damage, was to bring this suit in equity, praying a declaratory judgment or decree relative to the actual controversy described, and a declaration of the rights and other legal relations of the appellant and the appellees with respect to such controversy.

Wherefore the appellant prayed that the court render such a declaratory decree or judgment, including a declaration that the appellees have, under the seniority agreement of February 1, 1923, no legal right to perform the work in question, and that the award of the Board, insofar as it purports to confer such right upon them, is invalid.

times moved from another track against the head end of such train and coupled on to form a part of the train on its journey over the road; when trains of passenger cars have come into the station and discharged their passengers, the empty trains are sometimes moved a sufficient distance to permit the road engine which has brought the train into the station to be uncoupled from the train and proceed by a cross-over movement to another track. Many movements of the kinds just described are and always have been, since the commencement of operation of the Terminal in 1907, performed (where in the judgment of the managing officers of the appellant efficiency or promptness in the operation of the Terminal is thereby promoted) by the use of the road engine which has brought the train into the station or is about to haul the train to its destination, incidental to the movement of the road engine between the station and the enginehouse. In making such movements the road engine is and always has been manned by the road engine crew which is required as a part of its duties to deliver the road engine to the enginehouse at the end of a run and to bring the road engine from the enginehouse to the station at the beginning of a run. The road engine crews are employees of the Tenant Lines.

On February 1, 1923, the yard enginemen and firemen, employees of the appellant, acting through the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen as collective bargaining representatives, entered into a seniority agreement defining the terms of employment of enginemen and firemen. This superseded several previous agreements on the same subject. After the passage of the Railway Labor Act of 1934 (Act of June 21, 1934, 48 Stat. 1185), which set up a National Railroad Adjustment Board, hereinafter sometimes called the Board, for the adjustment of disputes between carriers and their employees, the appellant's employees asserted that under the agreement of February 1, 1923, they were entitled to perform the train movements above described as involved in this case. The appellant rejected the claim. Thereafter the employees carried the dispute, as under the Railway Labor Act they might, to the Board, to which they submitted their claim in writing; and the appellant, as it was obliged to do under the statute, separately stated its contentions to the contrary of the claim. The Board,

acting through its First Division of ten members, dead-locked, but, upon the selection of a referee as an eleventh member, it made an award on October 24, 1938, to the effect that the appellant's employees were entitled to perform the train movements in question. This award was made effective by an order of the Board of the same date. Except as the separate submissions filed with the Board may be regarded as such, the Board in considering the dispute received no pleadings or evidence and permitted no cross-examination; and it allowed no argument, written or oral, before the referee.

The appellant has never changed its operating practices to conform to the award. The Railway Labor Act authorizes a proceeding to enforce the award and order to be brought in an appropriate United States District Court by the persons for whose benefit the award was made, within two years from the time the cause of action accrues under the award. No such suit had been brought by the employees at the time of the filing of the instant action on December 29, 1938. Nevertheless, the employees, shortly after the date of the award and order of October 24, 1938, to wit, on November 23, following, made demands—and they continue to make such demands—upon the appellant for moneys alleged to be due them for the train movements in question although, since the appellant has not changed its operating practices, the employees do not actually perform these train movements. These demands amount for the period from November 23, 1938, to the date of filing the complaint to approximately $7,500, and they are accumulating at the rate of $80,000 per annum. The continuance of these demands and of the controversy concerning them may interrupt performance of the appellant's duty to serve the public. This action was filed by the appellant in the United States District Court to obtain a declaratory judgment of the rights and relations of the appellant and the appellees under the seniority agreement of February 1, 1923—the appellant contending that the appellees have no right to the work in question under that agreement or otherwise and that the award purporting to confer any such right is invalid, and asserting that it has no other adequate remedy, that the enforcement proceeding is not such so far as a carrier is concerned.

But the question immediately involved in this appeal is not what are the rights of the parties under the contract. It is, broadly stated, whether or not a carrier, party to a collective bargaining agreement with its employees, may obtain a judgment in a United States District Court declaring the rights of the parties to the agreement, notwithstanding that a dispute arising out of the interpretation of the agreement has, at the instance of the other party, the employees, been submitted to the National Railroad Adjustment Board and made the subject of an award and order by the Board in the employees' favor. I think that the carrier is entitled to such a judgment.

I

The Federal Declaratory Judgments Act provides, so far as immediately pertinent:

"(1) In cases of actual controversy except with respect to Federal taxes the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such." [Act of June 14, 1934, 48 Stat. 955, as amended by Act of August 30, 1935, 49 Stat. 1027.][3]

The facts stated in the appellant's complaint and admitted by the motion to dismiss constitute an orthodox cause for declaratory relief. From them there appears the existence of a dispute between the appellant and the appellees concerning the meaning of an agreement to which they are parties. The appellees have presented claims to the appellant for money—

the theory of the claims being that the contract of February 1, 1923, entitled them to do certain work; the appellant contends that the contract does not entitle them to do that work. The demands of the appellees are made under the contract, not under the award or order of the Board. This was conceded by the appellees in the court below.[4] Thus the complaint is one for declaration of "rights and other legal relations" of the parties to a contract. And the case is one of "actual controversy." It is "definite and concrete, touching the legal relations of parties having adverse legal interests." Ætna Life Ins. Co. v. Haworth, 1937, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000. It is "a real and substantial controversy admitting of specific relief under a decree of a conclusive character." Idem. Cf. also Maryland Casualty Co. v. Pacific Oil & Coal Co. and Joe Orteca, 1941, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826. Under the facts stated, daily demands for money are being made by the appellees under the contract, and refusal of payment is being made by the appellant; and the continuance of the controversy without adjudication is an impediment to the fulfillment of the appellant's duty to serve the public which may interrupt performance of that duty.

Moreover, under the facts, the appellant is obliged, in the absence of a declaratory judgment, to maintain moneys in large sums to pay the appellees' demands if ultimately held liable therefor, and as these are accumulating each day for each employee for the day's wages for work not performed, the appellant must either have

---

[3] Additional provisions of the Act are the following:

"(2) Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party, whose rights have been adjudicated by the declaration, to show cause why further relief should not be granted forthwith.

"(3) When a declaration of right or the granting of further relief based thereon shall involve the determination of issues of fact triable by a jury, such issues may be submitted to a jury in the form of interrogatories, with proper instructions by the court, whether a general verdict be required or not."

[4] The Memorandum Brief filed by the

appellees as defendants in the trial court was made a part of the record on appeal. In that brief the appellees said: "These claims, however, are *based upon the Agreement of 1923—not upon the order of the Board*." R. 117. "... when the individual defendants presented to the plaintiff, individual claims for compensation, they necessarily based those claims upon the Agreement—not upon the order which has no substantive effect and is in itself unenforceable. ... The plaintiff today is in exactly the same position as to its substantive rights and obligations as it was before the order was issued." R. 119. "It is thus apparent that the dispute between the parties to this case is one growing out of the interpretation and application which the carrier has made of the Collective Agreement of 1923, and that it has existed for some time." R. 71.

to pay the full accumulation of these demands, if eventually held liable therefor, or waive its rights once for all and immediately change its operating practices at greater expense and less efficiency; but if the appellant is presently advised of its duties, it could if necessary now change its operating practices and thus save the heavy penalty payments being demanded. In Ætna Life Ins. Co. v. Haworth, supra, the mere increase in the amount of insurance policy claims through the accrual of interest, and the inconvenience of having to be prepared to meet the claims at some future time, were held sufficient grounds for declaratory relief in respect of legal rights and obligations arising under insurance contracts. A *fortiori* the uncertainties and hazards to which the appellant under the facts stated in the instant case is subjected are sufficient to invoke exercise of declaratory jurisdiction. In E. Edelmann & Co. v. Triple-A Speciality Co., 7 Cir., 1935, 88 F.2d 852, 854, Lindley, District Judge, speaking for the court, said, in respect of the purpose of the Declaratory Judgments Act:

"... It was the congressional intent to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued. ...

This statement is borne out by the legislative history of the Act. The Judiciary Committee of the Senate, in recommending its passage, said:

"It enables disputes arising out of written instruments, or otherwise, to be adjudicated without requiring a destruction of the status quo and of the social and economic fabric. Experience has shown that a dispute can be adjudicated as effectively, if not more usefully, before the status quo has been destroyed." [Sen.Rep. No. 1005, 73rd Cong., 2d Sess., 1934]

In Borchard on Declaratory Judgments (1934), the leading text on the subject, it is stated that one of the important functions of declaratory judgment statutes is to afford an opportunity for determination of rights and liabilities under contracts. The author says (p. 405):

"... The opportunity to adjudicate such disputes without disruption of the relations between the parties, whether before or after purported breach, has demonstrated the utility and efficacy of the declaratory action, for it has enabled the parties to weather the storm of dispute without wrecking their legal craft and, on the contrary, to continue on the course with a clearly defined chart. Especially in long-term contracts has this proved an exceptional advantage, for it must be conceded that the traditional method of suing for damages on the first suggestion of breach frequently makes the continuation of the relation impossible. ..."

And see 16 American Jurisprudence 305, § 31, to the same effect.

Presumably declaratory judgment actions concerning contracts have in the majority of instances had to do with business contracts. But the suitability of declaratory relief for the determination of rights and liabilities under collective bargaining agreements is not to be doubted; it is indeed especially appropriate because of the public interest indirectly affected by such agreements. And both before and since the enactment of the Railway Labor Act of 1934 the courts have entertained proceedings for declaratory judgments as an appropriate remedy in respect of disputes arising out of agreements between carriers and their employees. See Piercy v. Louisville & N. R. Co., 1923, 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322; Burton v. Oregon-Washington R. & Nav. Co., 1934, 148 Or. 648, 38 P.2d 72; Louisville & N. R. Co. v. Bryant, 1936, 263 Ky. 578, 92 S.W. 2d 749.

Since the appellant's complaint thus states a case appropriate for the exercise of the declaratory judgment jurisdiction of a United States District Court, and since under the due process clause of the Fifth Amendment to the Constitution the courts are open to all who present a controversy which is the proper subject of judicial action, it follows necessarily that the trial court should not have dismissed the appellant's complaint unless some expression of Congressional intent, some principle or policy of law of which Congress must be said to have known, some necessary implication of statutory language, or of legislative history, forbade exercise of the jurisdiction. The question is one of Congressional intent. Was it the intent of Congress that the declaratory judgment jurisdiction of the District Courts should not be exercised under the circumstances of the instant case?

## II

No language of Congress in the Declaratory Judgments Act expressly excepts any cases of actual controversy, save those with respect to Federal taxes, from the jurisdiction of the District Courts to declare rights and other legal relations. No language of the Railway Labor Act of 1934 expressly forbids exercise of the declara-

tory judgment jurisdiction of the District Courts in respect of disputes arising out of collective bargaining agreements between carriers and their employees, or expressly vests in the District Courts, in the judicial enforcement proceedings provided for by paragraph (p) of Section 3 of the Labor Act, exclusive jurisdiction to determine or adjudicate the rights under such a collective bargaining agreement. One must therefore look to principles or policies of law, implications of statutory language, and legislative history, for an answer to the question in the case.

### III

Declaratory relief is not new. It dates —so far as Anglo-American legal history alone is concerned—from several centuries ago in Scotland and from the middle of the nineteenth century in England. There was a declaratory judgments statute in Rhode Island in 1876, in Maryland in 1888, in New Jersey in 1915; and by 1934, the year in which the Federal act was passed, some thirty-four American states and territories had adopted declaratory judgments acts. See Borchard, op. cit. supra, 237-245. In the course of the growth of declaratory judgments law, principles or policies of limitation were judicially recognized; and it is to be assumed that Congress, in passing the Federal act, intended that the exercise of jurisdiction for declaratory relief should be subject to such limitations of principle or policy as had prior to the passage of the Act been judicially recognized. The appellees urge as one such limiting principle or policy that a remedy by declaratory judgment cannot be invoked as a substitute for any special statutory proceeding. This is put by Borchard, 156–7, thus:

"Where ... a *special statutory* method for the determination of the particular type of case has been provided, it is not proper to permit that issue to be tried by declaration. This would amount to ousting of its jurisdiction a statutory court prescribed for the particular case, and it was not intended that a declaration should be employed for such a purpose. This, however, is quite different from refusing a declaration merely because a general or common-law remedy might have been invoked."

To similar effect see 16 American Jurisprudence 295, § 21. Does the Railway La-

bor Act of 1934 provide a special statutory method or prescribe a statutory tribunal for the determination of the particular type of case presented in the appellant's complaint —with the effect of forbidding declaratory relief?

The Railway Labor Act of 1934 includes within its enumerated purposes that of providing "for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." To this end the Act provides in substance and effect as follows: It is the duty of carriers and their employees to exercise every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes whether arising out of application of such agreements or otherwise, in order to avoid interruption to commerce or to the operation of a carrier. All disputes between a carrier and its employees are to be considered and if possible decided in conferences between representatives designated and authorized so to confer by the carrier and employees interested in the dispute respectively. The Act further states:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes. [Section 3(i)]"

The Act then sets up an Adjustment Board, composed as a whole of thirty-six members, eighteen selected by the carriers and eighteen by the national labor organizations of the employees, each member to be compensated by the party or parties he is to represent. The Board is composed of four divisions. The first (with which we are here concerned) has jurisdiction over disputes involving train and yard service employees of carriers,[5] and consists of ten

5 The other three divisions have jurisdiction over disputes involving other classes of employees. The second and third divisions, like the first, consist of

ten members each, five to be designated by the carriers and five by the national labor organizations of the employees. The fourth division consists of six mem-

members, five designated by the carriers and five by the national labor organizations of the employees from the membership of the full Board. Upon failure of any division to agree upon an award because of a deadlock or inability to secure a majority vote of the division members, such division is forthwith to agree upon and select a neutral person to be known as "referee" to sit with the division as a member and make an award. Should the division fail to agree upon and select a referee within ten days of the date of the deadlock, a referee is to be selected and named by the National Mediation Board—which also fixes and pays the compensation of the referee. [6] The awards of the several divisions of the Adjustment Board are to be stated in writing and a copy furnished the respective parties to a controversy; and the awards are made "final and binding upon both parties to the dispute, except insofar as they shall contain a money award." The Act provides that in case an ward is made in favor of a petitioner, the division of the Board making it shall also make an order directed to the carrier to make the award effective and, if the award includes a requirement for the payment of money, to pay to the employee the sum to which he is entitled on or before a day named. Finally, the Act provides:

"If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board. [Section 3(p)]

"All actions at law based upon the provisions of this section shall be begun within two years from the time the cause of action accrues under the award of the division of the Adjustment Board, and not after. [Section 3(q)]"

It thus appears that within the literal terms of the limiting principle as stated in the text of Borchard and American Jurisprudence, supra, the Congress has in the Labor Act provided a special statutory method and prescribed a statutory tribunal for the determination of the type of dispute involved in the instant case. And it is urged by the appellees that it is not proper to permit the instant dispute, because it is of the type referred to in the statute, to be made the subject of declaratory relief.

But an examination of the authorities cited by the two texts as evidencing the existence of this limiting principle demonstrates that by a "special statutory method" and a "statutory court prescribed" is meant an exclusive procedure or court. See Moore v. Louisville Hydro-Electric Co., 1928 226 Ky. 20, 10 S.W.2d 466; Mayor of Devonport v. Tozer, 1902, 2 Chancery 182; Smeeton v. Attorney-General, 1920, 1 Chancery 85; Flint v. Attorney-General, 1917, 1 Chancery 216; Haan v. Haan,

---

bers, three to be designated by the carriers and three by the national labor organizations of the employees.

6 The National Mediation Board is a board established by the Railway Labor Act of 1934 as an independent agency in the executive branch of the Government. Section 3(l) of the Act provides: "Upon failure of any division to agree upon an award because of a deadlock or inability to secure a majority vote of the division members, as provided in paragraph (n) of this section, then such division shall forthwith agree upon and select a neutral person, to be known as 'referee', to sit with the division as a member thereof and make an award. Should the division fail to agree upon and select a referee within ten days of the date of the deadlock or inability to secure a majority vote, then the division, or any member thereof, or the parties or either party to the dispute may certify that fact to the Mediation Board, which Board shall, within ten days from the date of receiving such certificate, select and name the referee to sit with the division as a member thereof and make an award. The Mediation Board shall be bound by the same provisions in the appointment of these neutral referees as are provided elsewhere in this Act for the appointment of arbitrators and shall fix and pay the compensation of such referees."

The Mediation Board has various other duties not here pertinent.

1928, 133 Misc. 197, 231 N.Y.S. 58; Mutrie v. Alexander, 1911, 23 Ont.L.R. 396; N. Y. & O. Ry. Co. v. Township of Cornwall, 1913, 29 Ont.L.R. 522; Wight v. Board of Education, 1926, 99 N.J.Eq. 843, 133 A. 387; Union Trust Co. v. Georke Co., 1928, 103 N.J.Eq. 159, 142 A. 560 (modified, in other respects, in 1929, 105 N.J.Eq. 190, 147 A. 439). And scrutiny of the authorities cited by these two texts also demonstrates certain grounds of decision which may be the necessary basis of distinction in respect of the instant case. Thus the following involve rights and liabilities not derived from the common law but from statute: Moore v. Louisville Hydro-Electric Co.; Mayor of Devonport v. Tozer; Smeeton v. Attorney-General; Flint v. Attorney-General; and Haan v. Haan, supra. In the following declaratory relief was refused upon the ground of the existence of another adequate remedy: Oldham County ex rel. Wooldridge, County Attorney, v. Arvin, County Road Engineer, 1932, 244 Ky. 551, 51 S.W.2d 657; Grand Junction Waterworks Company v. Hampton Urban District Council, 1898, 2 Chancery 331; Washington-Detroit Theater Co. v. Moore, 1930, 249 Mich. 673, 229 N.W. 618, 68 A.L.R. 105; Stenzel v. Kronick, 1929, 102 Cal.App. 507, 283 P. 93; G. Goldberg & Sons v. Gilet Bldg. Corp., 1929, 135 Misc. 158, 237 N.Y.S. 258; In re Sterrett's Estate, 1930, 300 Pa. 116, 150 A. 159; Kaaa v. Waiakea Mill Co., 1926, 29 Haw. 122; Ætna Life Ins. Co. v. Richmond, 1927, 107 Conn. 117, 139 A. 702; and Kimmell's Appeal, 1929, 96 Pa.Super. 488. And in the following declaratory relief was refused because the subject of the dispute was either pending in another action or was *res judicata:* Proctor v. Avondale Heights Co., 1923, 200 Ky. 447, 255 S.W. 81; State v. Board of Com'rs of Wyandotte County, 1924, 117 Kan. 151, 230 P. 531; Leafgreen v. La Bar, 1928, 293 Pa. 263, 142 A. 224; and Shearer v. Backer, 207 Ky. 455, 269 S.W. 543.

Cases especially cited by the appellees in support of the limiting principle above stated also variously deny declaratory relief for reasons similar to those above set forth: City of Erie v. Phillips, 1936, 323 Pa. 557, 187 A. 203, and Bell Telephone Co. v. Lewis, 1934, 313 Pa. 374, 169 A. 571, are rulings in terms of the proposition that a proceeding for a declaratory judgment will not be entertained where another statutory remedy has been specially provided for the character of case in hand. Petition of Kariher, 1925, 284 Pa. 455, 131 A. 265, contains a dictum to the same effect. But there was a special statute in Pennsylvania which governed the decision in these cases. Act of March 21, 1806, P.L. 558, 559, 4 Smith's Laws, pp. 326, 332 (46 P.S.Pa. § 156). That act provided in Section 13: "In all cases where a remedy is provided, or duty enjoined, or anything directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect." And it has been held in Pennsylvania that, by reason of the operation of this act, where a remedy or method of procedure is provided by statute it is exclusive. Ermine v. Frankel, 1936, 322 Pa. 70, 185 A. 269; White v. Old York Road Country Club, 1935, 318 Pa. 346, 178 A. 3; In re Stetson's Estate, 1931, 305 Pa. 62, 155 A. 856. Thus the statutory remedies, the existence of which were the foundation for the refusal of declaratory relief in Petition of Kariher, City of Erie v. Phillips, and Bell Telephone Co. v. Lewis, were necessarily exclusive. In McCalmont v. McCalmont, 1928, 93 Pa.Super. 203, there was an attempt to secure a declaratory judgment annulling a marriage. The Pennsylvania legislature had prescribed detailed procedural requirements necessary to be followed for divorce and annulment. Declaratory relief was therefore refused upon the ground that the statutory remedy was exclusive and that the safeguards thereof to the interests of the state were not to be swept away by the Pennsylvania declaratory judgments act. In Ætna Casualty & Surety Co. v. Quarles, 4 Cir., 1937, 92 F.2d 321, the refusal of a declaratory judgment was upon the ground that there was another action pending involving the same issue, and upon the further ground that the declaratory judgment sought would not dispose of the entire controversy. Young v. Bridges, 1933, 86 N.H. 135, 165 A. 272, Stewart v. Herten, 1933, 125 Neb. 210, 249 N.W. 552, and Moore v. Louisville Hydro-Electric Co. (already briefly commented upon), again illustrate the proposition that by "special statutory remedy" is meant an exclusive remedy. In Young v. Bridges there was an attempt in a court of general jurisdiction to obtain a declaratory judgment as to the inheritance of personal estate. Jurisdiction to determine such inheritance had

been committed to a probate court. In Stewart v. Herten it was sought to obtain by declaratory judgment a direction for a united corporate guardianship. The county courts in Nebraska had by statute exclusive jurisdiction in guardianship proceedings. These two cases recognize that declaratory judgment statutes do not enlarge judicial jurisdiction in the substantive sense, but only procedurally. This is of course correct, and was recognized in Ætna Life Ins. v. Haworth, and Ætna Casualty & Surety Co. v. Quarles, both cited supra. In Moore v. Louisville Hydro-Electric Co. declaratory relief in respect of rights under a Workmen's Compensation statute was refused upon the ground that declaratory judgment procedure did not supplant that of the Workmen's Compensation Board upon which the legislature of Kentucky had conferred exclusive jurisdiction in respect of industrial injuries.

It is urged by the appellees as a further limitation upon the exercise of declaratory judgment jurisdiction that it may not be used as a means for the review of administrative orders. Such a limitation is phrased by Borchard, op. cit. supra, 181, thus:

"... The declaratory action is not a substitute for a new trial, or an appeal from a former judgment deciding identical issues or issues which the court believes were passed upon."

In 16 American Jurisprudence 295–296, § 23, the limitation is more explicitly stated as follows:

"Questions already adjudicated by a court having jurisdiction of the subject matter and the parties cannot thereafter be the subject, between such parties and their privies, of an actual controversy within the meaning of this term in the Declaratory Judgments Act. The act is not intended to be used to elucidate or interpret judicial decrees or judgments already entered or to modify or declare rights thereunder. Hence, a declaratory judgment proceeding is not an appropriate method of obtaining the vacation of a judgment; and it would be entirely beyond the purpose and scope of the statute as well as contrary to fundamental principles for a court to attempt, in such a proceeding, to review and determine the validity of a judgment of a court of co-ordinate jurisdiction."

These statements are correct. But an examination of the authorities upon which they rest makes clear that they apply only where the prior judgment has been rendered by a judicial or at least quasi-judicial body. See: Shearer v. Backer, supra; Back's Guardian v. Bardo, 1930, 234 Ky. 211, 27 S.W.2d 960; Ladner v. Siegel, 1928, 294 Pa. 368, 144 A. 274; Williamsport v. Williamsport Water Co., 1930, 300 Pa. 439,

150 A. 652; Trustees of Columbia University v. Kalvin, 1929, 226 App.Div. 775, 235 N.Y.S. 4. This is made clear also by a reading of the cases especially cited by the appellees in this particular connection (which include Back's Guardian v. Bardo, just mentioned). In Back's Guardian v. Bardo an action had been filed by an executor to sell certain real estate, to secure an order construing a will, and for partition of property, and a judgment had been rendered granting the relief prayed for. Subsequently, a declaratory judgment suit was brought by one of the parties. This suit propounded certain questions relating "to the construction of the will and the regularity of the partition proceedings in the prior action brought for that purpose, and to the proper distribution of the estate." Declaratory relief was refused upon the ground that "The purpose of the [Kentucky] Declaratory Judgment Act was to have a declaration of rights not theretofore determined, and not to determine whether rights theretofore adjudicated had been properly adjudicated." But the prior adjudication had been by a validly constituted judicial tribunal, the Circuit Court of Campbell County, Kentucky. In Ferree v. Ferree, 1938, 273 Ky. 238, 115 S.W.2d 1055, Back's Guardian v. Bardo was followed in a ruling that a declaratory judgment proceeding was not to be availed of to pronounce void a divorce and alimony decree with incidental disposition of lands. But again the decree had been rendered by a validly constituted court exercising judicial powers, the Circuit Court of Hardin County, Kentucky. In Grooms v. Grooms, 1928, 225 Ky. 228, 7 S.W.2d 863, infants, through a next friend, attempted to attack by a declaratory judgment proceeding a prior judgment rendered in another court authorizing the sale of their property. The Court of Appeals of Kentucky, ruling that the previous judgment was voidable only, not void, held that it could not be collaterally attacked in a declaratory judgment proceeding. Here again the prior judgment had been rendered in a tribunal of competent jurisdiction exercising judicial power, the Greenup County Circuit Court. In Kings County Trust Co. v. Melville, 1926, 127 Misc. 374, 216 N.Y.S. 278, a declaration as to the validity of a lease was refused where the lease had already been authorized by the judgment of a competent court, to wit, the Supreme Court of Kings County, New York. In Haan v. Haan, more briefly referred to supra, a petition was filed for a

declaration that the infant plaintiff was the illegitimate child of the defendant and as such entitled to support. The petition was refused because in New York proceedings relating to a child born out of wedlock were within the special jurisdiction of the Court of Special Sessions of the City of New York, where a determination had already been had, which determination, never having been reversed, was held *res judicata.*

In Central High School Athletic Association v. City of Grand Rapids, 1936, 274 Mich. 147, 264 N.W. 322, also cited by the appellees, the Supreme Court of Michigan affirmed the action of the Superior Court of Grand Rapids, in Chancery, which in the exercise of its discretion had declined to issue a declaratory judgment determining rights which had already been passed upon by a Board of Zoning Appeals. But in that case an ordinance, the competency of which was not questioned, had made the decision of this Board final so far as it involved discretion or the finding of facts; and the decision of the Board had involved the exercise of discretion. It is to be noted also that zoning boards have jurisdiction to determine a class of rights created by statute, rather than having source in the common law, and assigned for adjudication to such boards as special tribunals.

The foregoing discussion of cases thus indicates that declaratory relief may be refused upon any of the following five grounds: First, that the prior determination sought to be attacked by declaratory judgment is of a judicial or quasi-judicial nature; second, that the subject of dispute is pending in another action or is *res judicata;* third, that another remedy is adequate; fourth, that the rights and liabilities involved in the dispute and with which another tribunal is authorized to deal derive not from the common law but have statutory origin; fifth, that a "statutory court prescribed" for the determination of a particular type of case has been given by the sovereign exclusive jurisdiction.

I think it clear that the refusal of declaratory relief in the instant case cannot properly be based on any of the first four of such grounds. As to the first ground—that the prior determination is of a judicial or quasi-judicial nature—that does not exist in the instant case, for the Adjustment Board is not a tribunal which either in composition or procedure is of judicial or quasi-judicial nature; and it did not in the instant case render its award upon such a hearing as entitles the award to be considered as having been judicially arrived at. The Board is bi-partisan in composition, one-half of the members being selected and designated by and for the purpose of representing the carrier and paid by the carrier, and the other half by and for the purpose of representing the employees and paid by them. It was conceded by the appellees before the trial court—and the concession is a part of the record on appeal—that:

"... The jurisdiction of the Board is to handle the dispute, not to make an interpretation of the agreement. The full significance of this distinction will be more apparent, we believe, when we consider the nature of the decision which the Board is empowered to make in relation to a dispute before it.

"The function of a court is to render a judgment between parties who are before it as litigants. Such a judgment has the effect of establishing the parties' present rights. With their future relations the Court has no concern, save to supervise the enforcement of its decree if necessary. It is a matter of common knowledge that while the adversary character of the proceedings of the courts, and the uncompromising nature of their decrees are well adapted to the decision of cases, they are not conducive to the establishment of cordial relationships between the parties in the future.

"In this regard the National Railroad Adjustment Board performs a function entirely different from that of the courts. The parties before it, carrier and employees, are parties to a continuing relationship. The *future* of that relationship is a matter of prime concern to the Board. The handling of a present dispute may involve incidentally a consideration of present legal rights, but the Board's function is not to adjudicate as to the rights, but to adjust the dispute regarding them in such manner that the parties may in the future be enabled to conduct the business of interstate commerce without friction, and without interruption.[7]

* * *

"Both in personnel and in organization this Board departs somewhat from traditional *judicial* concepts. Judicial tribunals are non-partisan and the litigant is protected in his cause by the impartiality of the judge. The Adjustment Board is bi-partisan rather than non-partisan, and one appearing before it is protected by the fact that half of its members are predisposed in his favor. If he can maintain this advantage and, in addition, secure the approval of one or more members whose natural predisposition is against him, his cause must surely be just and he will prevail.[8]"

In the instant case, under the facts as pleaded and admitted by the motion to dismiss, when the dispute was before the Board there were no pleadings joining issue

---

7 R. 132–3. 8 R. 86.

in the judicial sense of the term, but simply an ex parte submission by each side without reference to the submission of the other; no witnesses were called; no evidence was received except the ex parte submissions, if they may be called evidence, and these were without right of cross-examination; no record was made of the proceedings; the referee who cast the deciding vote in respect of the award considered no evidence except the ex parte submissions, and there was no argument before him, oral or written, by the parties or their representatives. The "findings" of the Board cannot properly be called findings of fact. The composition of the Board is in accordance with the statute, and the procedure is in accordance with the established practice of the Board as provided for by its rules.[9] The procedure does not satisfy the definition of quasi-judicial procedure as outlined by the Supreme Court of the United States in Morgan v. United States, 1936, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288:

"There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact. Nothing can be treated as evidence which is not introduced as such. ... Facts and circumstances which ought to be considered must not be excluded. Facts and circumstances must not be considered which should not legally influence the conclusion. Findings based on the evidence must embrace the basic facts which are needed to sustain the order. ...

"A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a *quasi-judicial* character. The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The 'hearing' is the hearing of evidence and argument. If the one who determines the facts which underlie the order has not considered evidence or argument, it is manifest that the hearing has not been given."

In respect of the second ground of refusal of declaratory relief: The subject of dispute in the instant case, to wit, the meaning of the collective bargaining agreement, is not pending in another action and is not *res judicata*. It is not pending in another action because the award has been made, and no enforcement proceeding commenced. It is not *res judicata* because the award was not an adjudication of the legal rights and liabilities arising under the agreement. This is not disputed in this appeal, and the discussion just concluded demonstrates it.

As to the existence of another adequate remedy, the third ground for refusing declaratory relief: Assuming that there is a remedy under the Railway Labor Act adequate to protect the rights of the appellant carrier, under Rule 57 of the Rules of Procedure for the District Courts of the United States, 28 U.S.C.A. following section 723c, "The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." I discuss in topic IV (1) the question of adequacy of the remedy under the Railway Labor Act.

Concerning the fourth of the grounds above set forth as warranting refusal of declaratory relief: The rights and liabilities involved in the instant case do derive from the common law, that is to say, they are rights arising out of contract, not out of the Railway Labor Act. This is conceded in the instant case, as has been pointed out above, and is confirmed by the fact that before the Railway Labor Act of 1934 was passed, labor agreements of the character involved here were the subject of controversy in the courts under applicable principles of common law and equity and the courts took jurisdiction of their interpretation or enforcement. McGregor v. Louisville & N. R. Co., 1932, 244 Ky. 696, 51 S.W.2d 953; Panhandle & S. F. Ry. Co. v. Wilson, Tex.Civ.App.1932, 55 S.W.2d 216; Gregg v. Starks, 1920, 188 Ky. 834, 224 S.W. 459; Rentschler v. Missouri Pac. R. Co., 1934, 126 Neb. 493, 253 N.W. 694, 95 A.L.R. 1; McCoy v. St. Joseph Belt R. Co., 1934, 229 Mo.App. 506, 77 S.W.2d 175; George T. Ross Lodge v. Brotherhood of R. R. Trainmen, 1934, 191 Minn. 373, 254 N.W. 590; Gary v. Central of Georgia R. Co., 1928, 37 Ga.App. 744, 141 S.E. 819; Long v. Baltimore & O. R. Co., 1928, 155 Md. 265, 141 A. 504.

The fifth ground said by the cases to warrant the refusal of declaratory relief where another procedure or tribunal has dealt or may deal with the case, to wit, that

the "special statutory method" or "statutory court prescribed" has been given by the sovereign exclusive jurisdiction, remains for consideration. If Congress intended that the procedure for adjustment of disputes under the Railway Labor Act, including the statutory enforcement proceeding provided by Section 3(p), should be a "special statutory method," or if Congress intended the Adjustment Board to be an exclusive "statutory court prescribed," then the trial court was warranted in dismissing the appellant's complaint seeking declaratory relief.

## IV

I am thus brought to a discussion of the question whether by some necessary implication of statutory language there is indicated a Congressional intent that the procedure before the Board and the statutory enforcement proceeding provided by the Railway Labor Act shall be exclusive. In this aspect of the case it is contended that: (1) the Labor Act provision of an enforcement proceeding in the District Courts implies that there should be no other access to courts for carriers for the reason that this statutory suit is adequate protection for them; (2) employees who fail to win an award by the Board are themselves disabled to have recourse to the courts; this implies that the carriers may not proceed in court except by defense to the statutory enforcement proceeding; (3) the provisions of the Labor Act imply an intention by Congress that the remedy under the Act shall be exclusive, for otherwise the employees will be deprived of procedural advantages afforded by the statutory remedy; (4) judicial construction of analogous language in the reparations provision of the Interstate Commerce Act and of the Packers and Stockyards Act requires the conclusion that the provisions of the Labor Act imply that the procedure and remedy thereunder are exclusive; (5) judicial construction of provisions for review of orders of the Securities and Exchange Commission, the Communications Commission, and the National Bituminous Coal Commission, requires the conclusion that the provisions of the Labor Act imply that the procedure and remedy

thereunder are exclusive; and (6) it is a necessary implication of the provisions of the Labor Act that the remedy under Section 3(p) is exclusive, for otherwise recourse to the courts by carriers would increase litigation and would render the Act unworkable.

(1) The argument under this contention is that an award and order of the Adjustment Board impose no legal compulsion upon the carrier, so that until the statutory suit is brought and won by the employees the carrier's rights remain unaltered; therefore the carrier can afford to wait, and is adequately protected if and when the employees bring suit. I think this contention is not supportable. An award under the Labor Act may take the form not of an order for the payment of money but of a finding that a claimant group is entitled to do certain work. Such a finding in effect serves notice on a carrier that it may, as the result of the statutory suit which the employees are empowered to bring, be required to change its operating practices, with the consequence not only of thus assigning the work described in the award to the claimant group but also of taking it away from others—since the claim on which such an award is based would not be made unless others were already performing the work in question. That is the type of award in the instant case. Thus the appellant is faced with a dilemma: On the one hand, if it disobeys the award and order and awaits the suit of the employees and loses that suit, it will then be obliged to pay the accumulated demands of the employees for the work which they in the meantime will not actually have done, together with the wages of the road engine crews of the Tenant Lines, who in the meantime have been performing the train movements in question. That the expense of the service of the road engine crews of the Tenant Lines in performing the train movements in question is ultimately borne by the appellant appears inferentially in the facts and is stated in the appellant's brief on appeal and not disputed by the appellees, and was admitted by the appellees in their third defense below. [10] In the meantime

---

10 While it is not in terms alleged in the complaint that the expense of the services of the road engine crews of the Tenant Lines in performing the switching service involved in the case is ultimately borne by the appellant, this fact may be reasonably inferred from the allegations that

the train movements in question in the case have been performed by the road engine crews of the Tenant Lines since the commencement of the operation of the Terminal in 1907 where, in the judgment of the managing officers of the appellant, efficiency and promptness in the opera-

also the appellant will have subjected itself to the risk of strike by its own employees. For it is contended by the appellant and not disputed by the appellees in their brief on appeal, and it was stated by the appellees in the trial court, [11] that the primary sanction of an award in favor of employees is not the statutory enforcement proceeding provided in the Labor Act, but the economic bargaining power of the employees. On the other hand, if the appellant obeys the award and changes its operating practices, it subjects itself to the danger of suit for breach of contract by the road engine crews of the Tenant Lines, who will thus have been deprived of the work which they have been performing. So long as the appellees do not bring the statutory suit this dilemma will continue unsolved—in the absence of a declaratory judgment. Nothing but the latter, unless the employees sue— and the appellant has no means of compelling them to sue—can determine the rights of the parties under the agreement of February 1, 1923, and thus enable the appellant, if necessary, to make present readjustments of its operating arrangements so as to fulfill its obligations to the appellees at less expense than by incurring the penalty payments which they are now demanding. Therefore the argument that the statutory remedy is exclusive by implication because

tion of the Terminal is thereby promoted. Moreover, the brief of the appellant states (p. 62) that as a result of the award it is "faced with the alternative of either so readjusting its practices as to comply immediately with the award, irrespective of its legal correctness, which may involve a large increase in the expenses of operation, or, on the other hand, if it waits until suit is brought and then loses in court, it will have to pay back wages to the claimant employes for the work which it should have permitted them to perform, in addition to the wages which in the meanwhile it must pay to the other employes who are actually doing the work." And again, in further discussion of the dilemma in which the appellant under the facts finds itself, the appellant's brief (p. 65) states: "If it proceeds immediately to put into effect the award of the Board it must displace the persons whom it is presently employing. These persons, who are not treated by the Board as necessary parties in the proceeding before it and who cannot under the statute be forced into those proceedings, are entirely free to institute suit in the courts against the carrier on their own contract, and in such a suit the courts may sustain their right to do the work in dispute. If they do so, then they are of course entitled to payment during the period in which they were displaced through the carrier's compliance with the award." These statements are not denied in the appellees' brief.

In the third defense the appellees, as defendants below, stated: "The practice of the plaintiff, which gave rise to the dispute in question, was and is to permit and require the train crews of the Tenant Lines to use the said road engines in the moving of empty and loaded cars and trains of cars from place to place in the yards of the plaintiff, when such movement does not constitute a portion of any through train run, but does constitute a switching service in the said yards.

"The defendants say further in this connection that at present, and for a long period of time in the past, the plaintiff and the Tenant Lines have recognized that the services described above are properly services of and for the plaintiff, and which it could be required to render. It has been, and now is, the practice to keep a strict accounting between the parties of the amount and value of such services, and periodically the plaintiff is required to pay, and does pay to the Tenant Lines, sums equal to the reasonable value of said services."

[11] It was stated in the Memorandum Brief filed by the appellees in the trial court and made a part of the record on appeal that: "The review process adopted was not the result of a haphazard selection, but forms an integral part of the whole Congressional plan. That plan, as we have seen, has its cardinal principal that the parties should be given every inducement to agree upon a practicable settlement of their differences. Thus, even if an order has been made by the Board, that Board has no authority to enforce it. No *legal* compulsion is placed upon a carrier to comply. The orders of the Board find their primary sanction in the collective economic bargaining power of the employees. Suit may be brought at any time within two years, thus affording ample opportunity for adjustment by agreement." R. 102–3.

To the effect that the economic bargaining power of the employees is the primary sanction of the awards of the Board see also "The National Railroad Adjustment Board," by William H. Spencer, University of Chicago Press, 1938, pages 52–59 inclusive, where the author discusses the nature and enforcement of awards. See in particular page 56.

it adequately protects the carrier's interest is not sound. On the contrary of the carrier's being given by the statute the protection to which it is justly entitled, it is exposed to consequences which it is the purpose of legal institutions to avoid, to wit, coercion without such legal recourse as will afford a reasonably prompt judicial determination of rights and relief from the hazards of conflicting demands.

The appellees rely upon Federal Trade Commission v. Claire Furnace Company, 1927, 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978, and Federal Trade Commission v. Maynard Coal Company, 1927, 57 App.D.C. 297, 22 F.2d 873. In the first of these cases the Federal Trade Commission had served a notice on companies in the coal, steel, and related industries ordering them to furnish the Commission with monthly reports concerning costs of production and the like. The Commission was acting under Sections 6 and 9 of the Federal Trade Commission Act of September 26, 1914 (38 Stat. 717, 721, 722, 15 U.S.C.A. §§ 46, 49), empowering it to gather and compile information concerning companies engaged in interstate commerce and to require the filing of reports or answers to specific questions, and giving the Commission power to require the production of documentary evidence. The companies disregarded the orders and filed in a United States District Court (the then Supreme Court of the District of Columbia, now the District Court of the United States for the District of Columbia) a bill alleging that the Commission had exceeded its powers and praying for an injunction against the effectiveness of the orders. The Federal Trade Commission Act in Section 10 (38 Stat. 723) provided penalties for failure to file the reports, but the penalties were not effective until thirty days after notice of default, which in this case had not been given. The only method provided by the statute for enforcement of the Commission's orders was, under Section 9, the institution by the Attorney General upon the request of the Commission of a mandamus action, and, under Section 10, the institution under the direction of the Attorney General of a proceeding in a District Court to recover the penalties. The District Court granted the injunction and this was affirmed by the Circuit Court of Appeals (the then Court of Appeals for the District of Columbia, now the United States Court of Appeals for the District of Columbia). 52 App.D.C. 202, 285 F. 936.

On appeal by the Commission to the Supreme Court of the United States the lower courts were reversed. The Supreme Court held that there was nothing that the Commission could have done to secure enforcement of the challenged orders, except to request the Attorney General to institute proceedings for mandamus or to supply him with the necessary facts for an action to recover the penalties, and that therefore until the Attorney General acted the companies could not suffer, and that when he did act they would then have full opportunity to contest the legality of any prejudicial proceeding against them, and that that right to contest was adequate and that hence they were not in a position to seek relief by injunction. In Federal Trade Commission v. Maynard Coal Company a similar question was presented, except that in that case the thirty-day notice had been served and the penalties were therefore running, although again no action had been taken by the Attorney General. The ruling followed the decision in the Supreme Court just discussed. But these two cases are not relevant to the instant situation. The orders involved were mere orders to file reports. They were made by the Federal Trade Commission acting as an arm of Congress to secure information for legislative purposes. They involved no contract rights and no adjustment of a dispute arising out of contract rights as does the instant case. Also, the orders were enforceable only upon the action of a governmental authority, to wit, the Attorney General, rather than being left, as is an award and order of the Adjustment Board, to the sanction of the economic bargaining power of an adversely interested private party, or to enforcement proceedings optional to such a party.

(2) Under this topic it is said by the appellees that one who has elected to pursue an administrative remedy is bound by the result, and for this reason and also because the statutory enforcement action provided by the Labor Act is available only to one who wins an award, the employees who fail to win an award are without further recourse, that is, may not themselves invoke the jurisdiction of the courts. Hence, argue the appellees, it is implied that the carriers may not proceed in court except by defense to the statutory enforcement proceeding. Assuming, *arguendo,* that the position taken by the appellees—that employees who fail to win an award before

the Board cannot have access to the courts upon the collective bargaining contract itself out of which a dispute grows—is correct, it is I think irrelevant to the further question whether or not the procedure before the Board and the statutory enforcement proceeding afforded by the Labor Act are exclusive so far as a losing carrier is concerned. It would seem more logical to conclude that it could hardly have been the intention of Congress to exclude either the employees or the carrier from recourse to the courts for a determination of their contract rights, whether or not they lost before the Board. Indeed the argument that the carrier cannot have recourse to the courts because employees losing before the Board cannot sue either under the Act or at all begs the very question in issue, to wit, whether the procedure provided for by the Labor Act is exclusive.

(3) The contention that the language of the Labor Act implies an intent by Congress that the statutory enforcement proceeding provided for therein shall be exclusive, for otherwise the employees would be deprived of procedural advantages afforded by the statutory remedy, is based upon those portions of Section 3(p) of the Act having to do with the selection by the employees of a forum, the allowance to them of attorney's fees and costs, and of a two-year period of time within which they may commence the statutory suit. The argument here made would conceivably be appropriate before Congress against the enactment of a declaratory judgment statute, but it has no more relevance to the instant case than to any other case. For it is a necessary consequence of the declaratory judgment procedure that it shall deprive a defendant of special advantages that he might have obtained by acting first and suing as plaintiff. It is the purpose of the Declaratory Judgments Act to enable a plaintiff to relieve himself of embarrassments arising from the failure of his opponent to make the declaratory judgment plaintiff a defendant in another proceeding. In any declaratory judgment suit brought to determine rights not yet sued upon by the defendant as plaintiff, the declaratory judgment suit plaintiff may choose to sue in the residence of the defendant, who might himself, had he brought action as plaintiff, have chosen another forum. In respect of attorney's fees and costs—many contracts provide for these in the event of suit by one of the parties. But the opposite party can cut

off this advantage if, in a declaratory judgment action first brought to determine the rights and duties under such a contract, he obtains a determination that he has no duty. So in respect of the statute of limitations, a potential defendant occupying a situation which may be the proper subject of a declaratory judgment action may, by commencing such an action prior to the bringing of suit by the potential plaintiff upon his claimed cause of action, cut down the statute of limitations applicable thereto. Thus it is apparent that the objection made in this aspect of the case to the declaratory judgment procedure is an objection to that procedure generally. If it applies here it must apply generally. If it does not apply generally, it cannot be urged here unless the statutory remedy under the Labor Act, including its special venue, attorney's fees and costs, and statute of limitations provisions, is exclusive—which is the very question in issue. If the remedy is exclusive there is no need to rely upon the objection. If it is not exclusive, the objection fails.

(4) Equal justice requires that similar terms of statutes enacted for like purposes should have like interpretations. In respect of proceedings in courts to enforce reparations orders made in favor of shippers and against carriers under Section 16(1), Section 16(2) of the Interstate Commerce Act, 34 Stat. 590 (1906), as amended by 36 Stat. 554 (1910), 36 Stat. 1167 (1911), and 41 Stat. 491 (1920) provides:

"If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may file in the district court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the road of the carrier runs, or in any state court of general jurisdiction having jurisdiction of the parties, a petition setting forth briefly the causes for which he claims damages, and the order of the commission in the premises. Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the commission shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit."

There is a similarly worded provision in the Packers and Stockyards Act, Section 309(f), 42 Stat. 166 (1921). The appellees

urge that under judicial interpretation of these statutes the enforcement proceedings provided for are exclusive, and the appellees say that Section 3(p) of the Labor Act is similarly worded and should be similarly construed.

I do not read the cases as holding that the reparations remedy of the Interstate Commerce and Packers and Stockyards Act is exclusive in the sense in which that term is being used in the instant case. In Brady v. Interstate Commerce Commission, D.C.N.D.W.Va.1930, 43 F.2d 847, affirmed Brady v. United States, 1931, 283 U. S. 804, 51 S.Ct. 559, 75 L.Ed. 1424, a shipper attempted to obtain an order setting aside and correcting findings made by the Commission in a reparations suit and requiring the Commission to make a supplemental order on the basis of the corrected findings. The action was brought in a United States District Court, under 36 Stat. 539 (1910), as amended by 38 Stat. 219 (1913), as one "to enjoin, set aside, annul or suspend in whole or in part any order of the Interstate Commerce Commission," 28 U.S.C.A. § 41(28), and a special court of three judges was asked for under the Urgent Deficiencies Act (38 Stat. 220 (1913), 28 U.S.C.A. § 47). But it was held that the action must fail, first because it was not brought to set aside an order of the Commission but only to correct alleged errors in the findings on which the order was based, and second because a reparations order of the Commission was not within the class of orders which Congress intended might be enjoined under the Urgent Deficiencies Act in a three-judge court. Baltimore & O. R. Co. v. United States, 3 Cir., 1937, 87 F.2d 605, also held that a three-judge District Court has no jurisdiction to enjoin a reparations order of the Interstate Commerce Commission. But these two cases, in holding that the remedy of injunction by a three-judge court is not available to a shipper against a reparations order of the Commission, hold nothing concerning the exclusiveness of the reparations remedy so far as other recourse to the courts by either shipper or carrier is concerned. In Baltimore & Ohio R. Co. v. Brady, 1933, 288 U.S. 448, 53 S.Ct. 441, 77 L.Ed. 888, relied upon by the appellees, an action was brought by a shipper against a carrier in a United States District Court in consequence of the failure of the carrier to comply with a reparations order of the Interstate Commerce Commission for damages found to have been sustained by reason of discrimination by the carrier in furnishing cars for the transportation of coal from the shipper's mine. The action was brought under Section 16(2) of the Interstate Commerce Act to enforce the Commission's order made under Section 16(1). In this suit the shipper sought and obtained judgment for a sum greater than the reparations award of the Commission. This judgment was affirmed in the Circuit Court of Appeals, but on certiorari to the Supreme Court there was a reversal. The Supreme Court pointed out that while Section 3, 24 Stat. 380, 49 U.S.C.A. § 3 (1887) of the Interstate Commerce Act makes it unlawful for a carrier to subject any person or traffic to unreasonable disadvantage, and while Section 8, 24 Stat. 382, 49 U.S. C.A. § 8 (1887) imposes upon carriers liability for the full amount of damage sustained in consequence of a violation of the Act, and while under Section 9, 24 Stat. 382 (1887) a person so injured may either make a complaint to the Commission (under Section 16(1) or bring suit for damages in a District Court, such a person, because of the further provisions of Section 9, "shall not have the right to pursue both remedies, and must select which method he will adopt." 288 U.S. at page 456, 53 S.Ct. at page 442, 77 L.Ed. 888. And the Court held that the shipper, having elected to seek relief through the Commission under Section 16(1) and (2) was not entitled to recover more than the amount of the award made under that section. Terminal Warehouse Co. v. Pennsylvania R. Co., 1936, 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827, and Western New York & P. R. Co. v. Penn Refining Co., 3 Cir., 137 F. 343, affirmed, 1908, 208 U.S. 208, 28 S.Ct. 268, 52 L.Ed. 456, also cited by the appellees, reflect the same rule as that laid down in the case just discussed. But these three cases rest upon the provisions of Section 9 of the Interstate Commerce Act which confers an election of remedies upon the shipper. They hold nothing concerning the exclusiveness of the statutory remedy so far as the carrier is concerned. Minds v. Pennsylvania R. Co., D.C.E.D.Pa.1916, 237 F. 267, 270, affirmed, 3 Cir., 1917, 244 F. 53, and, 1919, 250 U.S. 368, 39 S.Ct. 531, 63 L.Ed. 1039, cited by the appellees for the statement therein contained that "the complainant, being a volunteer, is concluded by what the [Interstate Commerce] Commission does,"—from which the appellees draw the inference that if the shipper fails

to win an award he has no recourse to the courts—is but dictum so far as that statement is concerned, because on the facts of the case the shipper prevailed. No cases are cited and I know of none which construe the reparations provision of the Packers and Stockyards Act in respect of exclusiveness.

But even assuming the existence of a judicial interpretation of the reparations provisions of the Interstate Commerce Act and the Packers and Stockyards Act to the effect that the reparations remedy is exclusive, in the sense that it forbids other recourse to the courts by either shipper or carrier, such an interpretation would, because of dissimilarity between the provisions and purposes of those two acts on the one hand and of the Railway Labor Act on the other, have no persuasive value in the instant case. The Labor Act contains no section expressly requiring an election of remedies. Again, the reparations remedy of the Interstate Commerce Act and the Packers and Stockyards Act is made available only in case of non-compliance of the carrier "with an order for the payment of money," whereas the remedy provided by Section 3(p) of the Labor Act is available in respect of any order of the Adjustment Board, including a direction to a carrier, as in the instant case, in respect of its operating practices. As has been pointed out in part (1) of this topic IV, the award in the instant case in effect says to the appellant that it must henceforth permit certain men, to wit, the appellees, to perform certain train movements, and thereby not allow other men to do that work. A legal proceeding to compel obedience to an award of this kind is much different in its incidents and consequences from a suit to recover money; and the grounds on which it might be held that a statutory action to recover money is by implication exclusive of all other forms of judicial relief, would have no necessary relevance to the question whether or not a statutory proceeding to enforce a claim to do certain work is exclusive. Still further, an interpretation of exclusiveness in the reparations remedy of the Interstate Commerce Act and the Packers and Stockyards Act would lack persuasive value in the instant case because the rights involved are different from those involved under such Acts. In the instant case the rights are common law rights arising out of a contract; under each of the other two Acts the rights are of a statutory character—the right to be charged in accordance with a schedule of rates—the right not to be made the subject of unreasonable preferences or prejudices. In respect of rights so created and assigned to the protection of a given tribunal, it might well be held that a special remedy provided by statute for enforcement of the rights was exclusive. Such a conclusion does not follow in the instant situation where the Adjustment Board has no authority to make a determination of contract rights as such, but only to adjust disputes arising out of the interpretation or application of collective bargaining agreements. Still further, the assumed judicial interpretation of exclusiveness in the reparations remedy of the Interstate Commerce and Packers and Stockyards Acts would not be persuasive in the instant case for the reason that the proceeding before the Adjustment Board differs vitally in nature from that before the Interstate Commerce Commission and the Department of Agriculture. The proceeding before these bodies is quasi-judicial in nature. It has been demonstrated above that this is not the case in respect of the Adjustment Board proceeding. I conclude that the rule that similar terms of statutes enacted for like purposes should receive like interpretation is inapplicable to the statutes compared in the instant case, "because the evils to be remedied, the objects to be accomplished, and the enactments requisite to attain them are radically different." United States v. Colorado & N. W. R. Co., 8 Cir., 157 F. 321, 330, 15 L.R.A., N.S., 167, 13 Ann.Cas. 893, certiorari denied 1908, 209 U.S. 544, 28 S.Ct. 570, 52 L.Ed. 919.

(5) The judicial decisions in respect of review of orders of the Securities and Exchange Commission, the Federal Communications Commission, and the National Bituminous Coal Commission cited by the appellees for the proposition that where a statute establishing an administrative tribunal provides an adequate method of review in the courts for its orders, such method is exclusive, and urged by the appellees as requiring the conclusion, by parity of reasoning, that the provisions of the Labor Act imply that the statutory enforcement proceeding thereunder is exclusive, are Securities & Exchange Commission v. Andrews, 2 Cir., 1937, 88 F.2d 441; Sykes v. Jenny Wren Co., 64 App.D.C. 379, 78 F. 2d 729, 104 A.L.R. 864, certiorari denied, 1935, 296 U.S. 624, 56 S.Ct. 147, 80 L.Ed. 443; Monocacy Broadcasting Co. v. Prall, 1937, 67 App.D.C. 176, 90 F.2d 421; and

Utah Fuel Co. v. National Bituminous Coal Commission, 1938, 69 App.D.C. 333, 101 F. 2d 426, affirmed, 1939, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483. In Securities & Exchange Commission v. Andrews the Commission had filed a bill of complaint in a United States District Court under Section 21(e) of the Securities and Exchange Act of 1934 (48 Stat. 881, 889, 15 U.S.C.A. § 78u(e), to enjoin the defendants—Andrews and others—from violating the provisions of Section 9 (48 Stat. 889, 15 U.S.C.A. § 78i) with respect to stock of Dictograph Products Company. While the suit was pending upon the bill, answer, and the Commission's motion for a preliminary injunction, the Commission made an order pursuant to Section 21(a) (48 Stat. 899) of the Act for an investigation to determine whether to suspend unlisted trading privileges in Dictograph stock pursuant to Section 12(f) (48 Stat. 892), as amended (49 Stat. 1375 (1936), 15 U.S.C.A. § 78l(f); and a subpœna duces tecum was issued by a Commission investigating officer directing the Company to appear before him. Thereupon the defendants filed a cross-bill of complaint to enjoin the Commission and its agents "from all activity with respect to" Dictograph stock. The trial judge dismissed the cross-bill for want of jurisdiction and want of equity. The Circuit Court of Appeals affirmed on the ground that the trial court was without jurisdiction to entertain the cross-bill, the theory of the decision being that a suit against the Commission, an administrative agency of the United States, can be maintained only in the courts and upon the terms specified in the statute. The court pointed out that Section 25(a) (48 Stat. 901, 15 U.S.C.A. § 78y(a) of the Securities and Exchange Act provides that "any person aggrieved by an order issued by the Commission . . . may obtain a review of such order in the Circuit Court of Appeals."[12] It held that the order to appear before the investigator was interlocutory and not reviewable under Section 25, but that even if it were reviewable, review could be had only in the Circuit Court of Appeals. But the case is not apposite, for the instant case is not a suit against the National Railroad Adjustment Board. Moreover, the statutory appellate procedure afforded under the Securities and Exchange Act is available to both parties. Still further, the Securities and Exchange Commission is a governmental body whose hearings are of a quasi-judicial nature. Similar distinctions exist in respect of Sykes v. Jenny Wren Co., Monocacy Broadcasting Co. v. Prall, and Utah Fuel Co. v. National Bituminous Coal Commission.

(6) In respect of the last argument in this aspect of the case—that it is a necessary implication of the provisions of the Railway Labor Act that the remedy under Section 3(p) is exclusive for otherwise recourse to the courts by a carrier would increase litigation and would render the Act unworkable: It is not to be doubted that if there is access to the courts for declaratory relief, carriers which, in view of a contract entered into with employees, regard an Adjustment Board award as unjust, will seek relief in the courts where the statutory suit is not promptly brought by the employees. And it is not to be doubted that this will in some degree lessen the effectiveness of awards which might otherwise be enforceable through the sanction of economic bargaining power. But the argument is one to Congressional intent. It is urged that the Adjustment Board is adapted to the settlement of disputes growing out of collective bargaining agreements between carriers and their employees, and that it has performed its function of settling such disputes with a high degree of success. It is asserted that an interpretation of a statute which must lead to weakening the success of an agency created by it is inadmissible if the statute is susceptible of another interpretation by which such a consequence can be avoided, for Congress will not be presumed to have intended a nugatory thing. 59 C.J. 961–4, § 571. But it is also cardinal that Congress will not be presumed to have intended a mischief or injustice. 2 Sutherland, Statutory Construction (2d ed. 1904) §§ 488–90; 25 R.C.L. 1022, § 258. And if a choice must be made between an interpretation which would lessen the ef-

---

[12] Section 25(a) provides: "Any person aggrieved by an order issued by the Commission ... to which such person is a party may obtain a review of such order in the Circuit Court of Appeals of the United States, within any circuit wherein such person resides or has his principal place of business, or in the Court of Appeals of the District of Columbia, by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part."

fectiveness of a statute and one which would result in unfairness, the former ought to prevail, for it ought not to be taken that Congress would intend to gain an end at the price of fairness. Such I think would be the consequence of the interpretation of the statute urged here by the appellees. For the consequence of the conclusion that recourse to the courts for a determination of the meaning of a collective bargaining contract between a carrier and its employees was not intended is that Congress did intend to set up a system of compulsory arbitration whereunder either party to a dispute arising out of a collective bargaining agreement could force the other into a proceeding before the Adjustment Board, and whereunder the award, when made, would be immunized against judicial relief unless the employees, having won, elected to bring a statutory enforcement proceeding instead of relying upon their economic bargaining power as the primary sanction of the award. And the further consequence is that Congress intended to give the Board in effect final power to determine contract obligations—since the disputes which it is to consider are of a legal nature "growing out of the interpretation or the application of agreements" (Section 2)—notwithstanding the fact that the Board is concededly an adjustment board rather than one to adjudicate legal rights and obligations, and notwithstanding that if the Board, rather than giving effect to the actual legal obligations of a contract, should disregard them, the award would in effect abolish actual obligations and substitute new ones, thus reducing collective bargaining agreements to virtual nullity—a result as unfortunate for employees as for carriers. Thus to hold that the statutory remedy must be construed as excluding other forms of judicial relief in order to make the provisions of the Railway Labor Act workable would require giving a definition to workable which Congress cannot be presumed to have intended.

I think it is not warranted to hold that the Railway Labor Act provisions necessarily imply an intent to deny right of access to the courts except in the enforcement proceeding of Section 3(p) because if not thus interpreted the effect will be, as the appellees urge, to increase litigation. The establishment of collective bargaining has resulted in the execution of a very large number of contracts between carriers and their employees governing rates of pay, rules and working conditions. These contracts, being the source of rights and obligations of importance to the parties, will inevitably lead to litigation. This Congress must be taken to have understood.

I thus conclude that by no necessary implication of statutory language is there indicated a Congressional intent that either the procedure before the Board or the statutory enforcement proceeding provided by the Railway Labor Act of 1934 shall be exclusive. Moore v. Illinois Central Railroad Company, 1941, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, although not directly in point on the facts for the reason that therein there had not been, as in the instant case, recourse to the Adjustment Board and an award and order, nevertheless interprets the Labor Act in a manner which I think tends to confirm the conclusion I reach. In that case the petitioner Moore, a member of the Brotherhood of Railroad Trainmen, brought suit for damages against the respondent Railroad Company, claiming that he had been wrongfully discharged contrary to the terms of a contract between the Trainmen and the Company. Originally commenced in the state courts, the action was ultimately removed to a United States District Court, which rendered judgment against the Company; but this was reversed by the Circuit Court of Appeals. *Inter alia,* the Company contended that the judgment in its favor should be sustained because both the District Court and the Circuit Court of Appeals "erred in failing to hold that Moore's suit was prematurely brought because of his failure to exhaust the administrative remedies granted him by the Railway Labor Act . . .." But the Supreme Court held otherwise. It said:

"... But we find nothing in that Act which purports to take away from the courts the jurisdiction to determine a controversy over a wrongful discharge or to make an administrative finding a prerequisite to filing a suit in court. In support of its contention, the railroad points especially to § 153(i) [Section 3(i), 48 Stat. 1191], which, as amended in 1934, provides that disputes growing out of grievances or out of the interpretation or application of agreements 'shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.' ... It is to be noted that the section pointed out, § 153(i), as amended in 1934, provides no more than that disputes 'may be referred ...

to the ... Adjustment Board ... .' It is significant that the comparable section of the 1926 Railway Labor Act (44 Stat. 577, 578) had, before the 1934 amendment, provided that upon failure of the parties to reach an adjustment a 'dispute shall be referred to the designated Adjustment Board by the parties, or by either party ... .' This difference in language, substituting 'may' for 'shall', was not, we think, an indication of a change in policy, but was instead a clarification of the law's original purpose. For neither the original 1926 Act, nor the Act as amended in 1934, indicates that the machinery provided for settling disputes was based on a philosophy of legal compulsion. On the contrary, the legislative history of the Railway Labor Act shows a consistent purpose on the part of Congress to establish and maintain a system for peaceful adjustment and mediation voluntary in its nature. The District Court and the Circuit Court of Appeals properly decided that petitioner was not required by the Railway Labor Act to seek adjustment of his controversy with the railroad as a prerequisite to suit for wrongful discharge. ... [312 U.S. at pages 634–636, 61 S.Ct. at page 756, 85 L.Ed. 1089]"

The appellees cite Railroad Yardmasters of North America, Inc., v. Pittsburgh & Lake Erie Railroad Company, D.C.N.D. Ohio 1940, 39 F.Supp. 876. In that case the individual defendants had obtained favorable awards from the National Railroad Adjustment Board, Fourth Division, granting them a higher status on a yardmasters' seniority roster in the East Youngstown yard. Compliance with these awards by the Railroad would place other employees whose names appeared on the same roster in a less favorable seniority position. The Railroad Yardmasters of North America, Inc., on behalf of employees whose seniority rights would be thus adversely affected, filed a complaint for a preliminary injunction enjoining all of the defendants from putting the award into effect, and prayed upon final hearing a permanent injunction. The complaint asserted that in making the awards the Board acted without jurisdiction and that its proceedings were in violation of the statutes establishing it and governing its procedure. The answers of the individual defendants asserted that the court had no jurisdiction, and on this ground the court dismissed the complaint. The theory of the decision was that the enforcement proceeding provided for by Section 3(p) of the Railway Labor Act was exclusive, and that no indirect review or collateral attack of the Board's awards, such

as was sought in the complaint, was permissible. This case, although it involves a form of action different from that in the instant case, is nevertheless contrary, so far as its *ratio decidendi* is concerned, to the position I take herein. But I think it not persuasive. On the contrary, in my opinion, it illustrates the unfortunate results attendant upon a conclusion that the Railway Labor Act provides an exclusive remedy for determining disputes arising under agreements between carriers and their employees. If the Railroad was willing to comply with the awards—which it apparently was, in view of the injunction suit—there would be no necessity for the successful seniority right claimants to institute an enforcement proceeding under Section 3(p), and yet the Railroad's compliance with the awards might diminish or destroy the rights of other employees, and this whether or not they were given notice of the proceedings before the Board or an opportunity to be heard. And since under the decision of the District Court they are forbidden access to the courts, except in the event of an enforcement proceeding, they are effectually denied all judicial determination of their rights.

### V

Is there some implication of legislative history to the effect that exercise of declaratory judgment jurisdiction of the United States District Courts is forbidden in such cases as the instant case because the procedure before the Board and the statutory remedy provided for in the Railway Labor Act of 1934 are exclusive? I find none. The Reports of the House and Senate Committees recommending the bill which became that Act (H.R.Rep.No.1944; Sen.Rep. No.1065, 73rd Cong., 2d Sess., 1934) show it to be an outgrowth of the Railway Labor Act of May 20, 1926 (44 Stat. 577) and indicate that it was designed *inter alia* to correct two defects in that Act: one, the possibility left open by the language of the 1926 Act that adjustment boards would cover only a part of the national railroad system; the other, the contingency of a deadlock. The House Committee Report stated:

"The second [13] major purpose of the bill is to provide sufficient and effective means for the

---

13 The Report states the purposes of the bill to be: "1. To prohibit any interference with freedom of association among employees and to prevent the de- nial of the right of employees to join a labor organization as a condition precedent to their employment. 2. To provide for the complete independence of car-

settlement of minor disputes known as 'grievances', which develop from the interpretation and/or application of the contracts between the labor unions and the carriers, fixing wages and working conditions. The present Railway Labor Act provides for the establishment of boards of adjustment by agreement. In many instances, however, the carriers and the employees have been unable to reach agreements to establish such boards. Further, the present act provides that when and if such boards are established by agreement, the employees and the carriers shall be equally represented on the board.

"Many thousands of these disputes have been considered by boards established under the Railway Labor Act; but the boards have been unable to reach a majority decision, and so the proceedings have been deadlocked. These unadjusted disputes have become so numerous that on several occasions the employees have resorted to the issuance of strike ballots and threatened to interrupt interstate commerce in order to secure an adjustment. This has made it necessary for the President of the United States to intervene and establish an emergency board to investigate the controversies. This condition should be corrected in the interest of industrial peace and of uninterrupted transportation service. This bill, therefore, provides for the establishment of a national board of adjustment to which these disputes may be submitted if they shall not have been adjusted in conference between the parties. The provisions as to the national board of adjustment are as follows:

 * * *

"(g) If any division of the Board should deadlock on a dispute, then the representatives on the Board will endeavor to select a neutral or impartial person; and if they are unable to agree upon the selection of such neutral person, then the United States Board of Mediation will appoint a neutral person. The dispute will then be again considered and a majority decision reached."

While the foregoing language makes clear that the Committee regarded the compromise or adjustment, through the means provided, of minor disputes known as "grievances," arising from the interpretation of collective bargaining agreements between carriers and their employees, as desirable, it neither expresses nor implies disparagement of the right of judicial determination of legal issues. The Supreme Court in Pennsylvania R. Co. v. United States Railroad Labor Board, 1923, 261 U.S. 72, 84, 43 S.Ct. 278, 67 L.Ed. 536, said of an earlier adjustment board (the adjustment board established under title III of the Transportation Act of 1920):

"But Title III was not enacted to provide a tribunal to determine what were the legal rights and obligations of railway employers and employees, or to enforce or protect them. Courts can do that. The Labor Board was created to decide how the parties ought to exercise their legal rights so as to enable them to coöperate in running the railroad. It was to reach a fair compromise between the parties without regard to the legal rights upon which each side might insist in a court of law. ...."

Undoubtedly the function of the Board in facilitating compromise of disputes is useful and important, but it is not to be implied from an indication by the Committee that settlements are desirable or from the fact that Congress set up an agency of adjustment, that it was the intention of Congress to forbid the adjudication of legal rights by the courts.

No intention to affect or change the provisions defining the nature and functions of the National Railroad Adjustment Board appears in the legislative history. Under the 1934 Act a group of carriers and their employees may still establish a separate board, and if they do so, the National Board has no function in respect of disputes which are subject to the separate board. The language of the 1934 Act concerning the functions of the National Board is substantially that of the 1926 Act except that the latter said that disputes "shall be referred" whereas the 1934 Act says "may be referred" to the Board. I think it clear from the parallelism between the two Acts that the function and place of the 1934 Board were intended by Congress to be identical with the function and place of the adjustment boards under the 1926 Act. This is confirmed by the statement of the Supreme Court quoted supra from Moore v. Illinois Central Railroad Company. And there has been no suggestion in the instant case that there was any intention by Congress under the 1926 Act to substitute adjustment board proceedings for those of the courts, that is, to deny to parties to adjustment proceedings access to the courts for the determination of their legal rights under collective bargaining agreements out of which disputes have arisen.

Not only do I find no indication in the legislative history in respect of the 1934

___

riers and of employees in regard to self-organization in order to carry out the purposes of this act. 3. To provide for the prompt and orderly settlement of all disputes growing out of grievances and out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, so as to avoid any interruption of commerce or of the proper operation of any carrier engaged therein."

Act as a whole of an intention to make the Adjustment Board and its procedure exclusive, but also I find no legislative history indicating that Congress intended that the special statutory suit made available under the 1934 Act to employees who have succeeded in obtaining a favorable award, was intended to be an exclusive remedy and thus to cut off access to the courts for the carriers for declaratory or other relief. There is no reference in the Committee Reports on the 1934 Act, or in the discussion on the floor, to the statutory action provided for by Section 3(p); and neither of the Reports mentions Section 3(p) as introducing any change over the 1926 Act. And yet if that section forbids access to the courts in other forms of action, the 1934 Act represents a serious change over the 1926 Act. It would seem likely that, if it had been the intention of the Committees to accomplish such a change, they would have said so.

## VI

It is a settled rule of statutory construction that courts will if possible avoid such an interpretation of a statute as will raise serious doubts as to its constitutionality. I think the construction which the appellees put upon the Railway Labor Act would threaten its validity. For the position of the appellees can hardly be limited to declaratory relief. The argument is that Congress has made the adjustment procedure and statutory enforcement proceeding, in the event of an award, exclusive. The consequence must then be that there is no access to the courts whatever either for damages or by way of injunction or for declaratory relief. The last is but remedial. Declaratory judgments statutes add nothing to the substantive jurisdiction of the Federal courts. Ætna Life Ins. Co. v. Haworth and Ætna Casualty & Surety Co. v. Quarles, both cited supra. There is of course no constitutional right to a declaratory judgment as such, but if the Labor Act is construed to bar all judicial relief to the carrier party to a collective bargaining agreement this would deny the carrier due process of law, since deprivation of remedy in the courts would destroy the character of collective bargaining agreements as contracts for the carrier. For the reasons stated in topic IV (1), the remedy afforded the carrier by way of defense to the enforcement proceeding available to employees only under Section 3(p) is in effect no protection. "Without the remedy"—meaning an adequate remedy—"the contract may, indeed, in the sense of the law, be said not to exist, and its obligation to fall within the class of those moral and social duties which depend for their fulfilment wholly upon the will of the individual. The ideas of validity and remedy are inseparable." Von Hoffman v. Quincy, 1866, 4 Wall. 535, 552, 18 L.Ed. 403. Therefore a contract right will have been taken without due process of law.

It is elementary constitutional law that when the legislature provides a remedy but interposes such conditions precedent to its availability that the hazards and burdens incident to its use can reasonably be expected to deter resort to it, the courts will provide relief in an appropriate proceeding even though the statutory remedy is plainly intended to be exclusive. Oklahoma Operating Co. v. Love, 1920, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596. In the instant case the power to institute judicial proceedings under the remedy provided in Section 3(p) is placed solely in the hands of the other party to the controversy, to wit, the appellees. The appellant is powerless under the statute to take action itself to set in motion the judicial machinery said to be available to it for relief And in the interval it is subjected to hazards so great and cumulative that, from the judicial notice which will be taken of what is to be expected from reasonable persons, it is apparent that it will prefer not to wait but to yield. Under such circumstances the judicial remedy apparently held out by the language of the statute is illusory. It is denied by the actualities of the situation of the parties.

A further constitutional threat to the statute through the appellees' construction of the Labor Act is this: If the hazards of waiting for employees to bring the statutory action are so serious and deterrent that a carrier has no choice in actuality but to obey the award of the Board, then the result in effect is to give the Board final authority to determine contract rights. That is an exercise of judicial power. There can be no valid delegation of governmental power to nongovernmental agencies. Carter v. Carter Coal Co., 1936, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. The Adjustment Board, consisting of bi-partisan groups paid by and set up to represent the employees and carriers respectively, is not a governmental agency.

In summary, I am of the opinion that: The appellant's complaint states a case appropriate for the exercise of declaratory judgment jurisdiction of a United States District Court. No expression of Congressional intent, no principle or policy of law, no necessary implication of statutory language or of legislative history, forbids exercise of the jurisdiction under the circumstances of the instant case. Under the due process clause of the Fifth Amendment the courts are open to all who present a controversy which is the proper subject of judicial action. No impediment to the appellant's action appearing, the trial court should not have dismissed the complaint.